Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/23/2020 10:11 AM CDT

TNT CATTLE COMPANY, INC., APPELLEE,
v. DIANNA FIFE, APPELLANT.

___ N.W.2d ___

Filed January 31, 2020.    No. S-18-1067.

1. **Declaratory Judgments.** An action for declaratory judgment is sui
   generis; whether such action is to be treated as one at law or one in
   equity is to be determined by the nature of the dispute.
2. **Declaratory Judgments: Appeal and Error.** In appellate review of
   an action for a declaratory judgment in a law action, factual find-
   ings by the trier of fact will not be set aside unless such findings are
   clearly erroneous.
3. **Breach of Contract: Leases.** An action for breach of a lease agreement
   is an action at law.
4. **Jurisdiction: Pleadings: Appeal and Error.** Factual findings in a
   court's determination of a factual challenge to subject matter jurisdiction
   are reviewed under a clearly erroneous standard.
5. **Parties: Words and Phrases.** An indispensable party to a suit is one
   whose interest in the subject matter of the controversy is such that the
   controversy cannot be finally adjudicated without affecting the indis-
   pensable party's interest, or which is such that not to address the interest
   of the indispensable party would leave the controversy in such a condi-
   tion that its final determination may be wholly inconsistent with equity
   and good conscience.
6. **Parties: Waiver.** Neb. Rev. Stat. § 25-323 (Reissue 2016) deprives a
   court of the authority to determine a controversy absent all indispensable
   parties and cannot be waived.
7. **Parties.** The burden of procuring the presence of all indispensable par-
   ties is on the plaintiff.
8. **Breach of Contract: Time: Words and Phrases.** An anticipatory
   breach of contract is one committed before the time has come when
   there is a present duty of performance and is the outcome of words or
   acts evincing an unequivocal repudiation of the contract.

9. **Breach of Contract: Time.** When there is an anticipatory breach, the promisee has the option to treat the contract as ended so far as further performance is concerned and maintain an action immediately rather than await the promisor's time for performance.

10. **Pleadings: Evidence: Trial.** A party may at any and all times invoke the language of his opponent's pleadings on which the case is being tried on a particular issue as rendering certain facts indisputable.

11. **Pleadings: Evidence: Waiver.** The pleadings in a cause are not a means of evidence, but a waiver of all controversy, so far as the opponent may desire to take advantage of them, and therefore, a limitation of the issues.

12. **Pleadings.** Statements in pleadings remain binding only until the pleading is amended.

13. **Pleadings: Evidence.** Matters contained in superseded pleadings are simple admissions that are admissible as evidence of the facts alleged therein and may be introduced and considered the same as any other evidence.

14. **Pleadings.** A judicial admission does not extend beyond the intendment of the admission as clearly disclosed by its context and must be unequivocal, deliberate, and clear, and not the product of mistake or inadvertence.

15. **Property: Contracts: Leases.** A transferor of an interest in leased property, who immediately before the transfer is obligated to perform an express or implied promise of the lease resting on privity of contract, continues to be obligated after the transfer.

16. **Landlord and Tenant: Leases: Liability.** A landlord who has transferred his or her interest in the land remains liable under a lease agreement, on the implied promise of quiet enjoyment, for disturbances of the tenant by the former landlord himself or herself or by someone whose conduct is attributable to the former landlord.

17. **Leases: Evidence: Intent.** Where the terms of a written lease appear to be ambiguous and uncertain as to the intended length of the tenancy or the beginning or end of the term, then, as in other cases of ambiguity, parol evidence may properly be resorted to for the purpose of resolving the uncertainty and explaining the parties' true intentions in that respect.

18. **Contracts.** Instruments made in reference to and as part of the same transaction are to be considered and construed together.

19. **Contracts: Intent: Appeal and Error.** When a document is ambiguous, it is for the trier of fact to determine the intent of the parties from all the facts and circumstances, and such findings will be upheld on appeal unless they are clearly erroneous.

20. **Contracts: Rescission: Words and Phrases.** A "rescission" amounts to the unmaking of a contract.
21. **Contracts.** A modification continues the original contract with some changes.
22. **Contracts: Rescission.** In determining whether a rescission took place, courts look not only to the language of the parties but to all the circumstances.
23. **Contracts: Rescission: Intent.** Mutual rescission of a contract must be clear, positive, unequivocal, and decisive, and it must manifest the parties' actual intent to abandon their contract rights.
24. **Breach of Contract: Damages.** In a breach of contract case, the ultimate objective of a damages award is to put the injured party in the same position the injured party would have occupied if the contract had been performed, that is, to make the injured party whole.
25. ____: ____. One injured by a breach of contract is entitled to recover all its damages, including the gains prevented as well as the losses sustained, provided the damages are reasonably certain and such as might be expected to follow the breach.
26. **Damages: Proof.** While damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural.
27. ____: ____. Uncertainty as to the fact of whether damages were sustained at all is fatal to recovery, but uncertainty to amount is not if the evidence furnishes a reasonably certain factual basis for computation of the probable loss.
28. **Damages: Appeal and Error.** The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved.

Appeal from the District Court for Buffalo County: William T. Wright, Judge. Affirmed.

Jack W. Besse, of Parker, Grossart & Bahensky, L.L.P., for appellant.

Siegfried H. Brauer, of Brauer Law Office, for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## I. NATURE OF CASE

This appeal involves a dispute between an out-of-state land-lord and her tenant as to the duration of their farm lease agreement. Two writings were considered by the court as embodying their agreement, one which stated that the "lease period will go from January 2007 until December 2017 a ten year period" and the other providing that "[t]he land will be maintained . . . from January 2007 until December 2017." The court found for the tenant that there was an 11-year lease and awarded damages for breach of contract. The landlord argues on appeal that the lower court lacked jurisdiction to issue the judgment, because title to the farmland was transferred into a trust before the tenant was evicted, and that therefore, the landlord in her capacity as sole trustee of the trust was an indispensable party. On the underlying merits, the landlord asserts that the lease was for 10 years and that, in any event, an oral modification replaced the written agreement such that an oral year-to-year lease governed when she gave notice of termination. The landlord also argues that the district court's calculation of the tenant's damages was based on speculative and conjectural evidence. We affirm the judgment below.

## II. BACKGROUND

Rowland Trampe is the sole owner and president of TNT Cattle Company, Inc. (TNT). He entered into a long-term lease agreement with Dianna Fife to lease farmland located at "Section Twenty-Six (26), Township Ten (10) North, Range Seventeen (17), West of the 6th P.M., Buffalo County, Nebraska" (Fife farm). When Fife indicated to Trampe that he should vacate the Fife farm before the end of the lease term as understood by Trampe, TNT sued Fife. The fundamental disagreement between TNT and Fife was whether their writ-ten agreement provided that the lease period would end in December 2016 or in December 2017 and, further, whether a subsequent oral agreement to change the crops grown on the Fife farm rescinded the written agreement such that they were

operating under an oral year-to-year lease when Fife advised Trampe the tenancy would be ending.

TNT's original complaint was filed on April 19, 2017, and relied on a singular document containing the parties' notarized signatures and stating that the "lease period will go from January 2007 until December 2017 a ten year period." An amended complaint claimed that this document in conjunction with another document executed at the same time constituted the written agreement between the parties. The other document, containing the notarized signatures of the parties dated the same as the first document, described that "[t]he land will be maintained by TNT . . . from January 2007 until December 2017," without mention of a "ten year period."

TNT alleged in its original complaint filed on April 19, 2017, that "[Fife] has forwarded certain communications to [TNT] within the last few months that taken together indicate that [Fife] intends to breach the Lease and deny [TNT] possession of and access to the [Fife f]arm for the 2017 crop year." More specifically, TNT alleged Fife had asserted that the lease would terminate as of December 31, 2016, and that she had the right to exclude TNT after that date. TNT sought injunctive relief from any action by Fife to terminate the lease or dispossess TNT from the Fife farm before December 31, 2017; declaratory judgment that the lease ran through December 31, 2017; and damages for anticipatory breach of the lease. In the amended complaint, filed on September 14, 2017, TNT repeated the allegations of the original complaint, alleging still that TNT's "anticipated dispossession" for the 2017 crop year would cause TNT irreparable harm and that in the event TNT is not granted injunctive relief, it would suffer damages for lost profits from the 2017 crop year.

Fife, in her answers, alleged that the parties had agreed that the lease term would end on December 31, 2016, and that any reference to "December 2017" was a mistake that should be construed against TNT, which she alleged was the scrivener. She alleged that, in any event, the long-term lease agreement

was no longer controlling, because it was subsequently modified to an oral year-to-year lease. Fife counterclaimed against TNT for an accounting of her crop share during the course of their lease agreement, intentional interference with the contractual relationship with a lease agreement between "defendant" and a new tenant, and trespass, when Trampe allegedly allowed his cattle to graze on stalks on the Fife farm in the fall and winter of 2009 through 2012. TNT did not file any pleading in response to the counterclaim.

After a pretrial hearing, the court found the evidence insufficient to warrant a temporary injunction, reasoning that TNT had failed to establish a clear right to an injunction by virtue of the lease agreement, because that agreement was ambiguous. A bench trial was held on permanent injunctive relief and the underlying claims of declaratory judgment and breach of contract, bifurcating the trial on the underlying merits of these claims from a determination of any damages. Trial on Fife's counterclaim was postponed until after the court's determination on Fife's claims. The court ultimately found that injunctive relief was moot, but found in favor of TNT for breach of contract and awarded TNT damages.

### 1. Oral Year-to-Year Lease
### From 2003 to 2008

The evidence at trial demonstrated that Fife had purchased the Fife farm in January 2003 and that from that time until 2008, Trampe farmed the land under an oral year-to-year arrangement. Prior to Fife's acquisition, Trampe had been farming the land for the previous landlord.

### 2. Long-Term Written Lease
### Agreement for Row Crop

Trampe testified that in the summer of 2007, he and Fife began discussing putting an irrigation pivot on the Fife farm in order to utilize all the approved irrigated acres and thereby not lose the Fife farm's designation with the U.S. Department of Agriculture Farm Service Agency. Trampe noted that the

dry hay was "becoming older hay and was going to fizzle out" anyway.

Trampe offered to assist at his own expense with some of the "dirt work" necessary for installation of a pivot so long as he could recoup that investment through a 10-year lease. The pivot was installed and began operation in 2008 for the 2008 farm year.

According to Trampe, he understood that the 10-year lease period would commence once the pivot was in place. Trampe explained that when negotiating the new arrangement, he was aware that the pivot would not be installed until the spring of 2008. Thus, he understood that the duration of the new lease would be for one final year of dryland hay production plus 10 years of irrigated row crop production.

Fife acknowledged multiple telephone conversations with Trampe generally pertaining to installation of pivot irrigation, but she could not recall "anything at all" with respect to what was said.

### (a) Exhibits 3 and 4

Trampe testified that after discussing the matter at length over the telephone, Fife mailed a lease document to him with the crops and percentages left blank. The original draft lease agreement sent by Fife with items left blank was entered into evidence as exhibit 4. Trampe explained that he had found the document the night before the trial.

The document as sent by Fife originally provided: "The land will be maintained by TNT Cattle Co, . . . from January 2007 until December 20__." Further, several lines of the document described that "[c]rop percentage will be __% for the sale of [specified crop]," alternating "for TNT Cattle Co." and "for Dianna S. Fife Trust." These lines specified alfalfa, soybeans, and corn. Four similar lines following left the crop blank. The document provided that "None of Dianna S. Fife heirs may contest this contract."

The forwarding letter, exhibit 3, which Trampe had also located the evening before trial, stated in relevant part:

I am enclosing a rough draft of a contract for us to sign. See what you think and let me know. If you like it, just fill in the number of years in the blank and the percentage of crops etc. You can re-type it if you like. I think you will need to initial the % areas when you go to a Notary. I will have to do the same so they know we both agree on it. You can go to a Notary and then send them to me and I will sign them in front of a Notary. I will send your copy back to you and I will keep a copy. I have no problem with the number of years you want to work the land. I don't plan to sell it for a long time.

Fife did not recall the letter, but acknowledged that her signature was on it.

The blank for the end date of the lease period in exhibit 4 was filled in by Trampe as 2017. Trampe filled in the percentages for the sale of alfalfa as 50 percent to TNT and 50 percent to the "Dianna S. Fife Trust." Trampe filled in the blanks for the lines pertaining to soybeans and corn as 66.7 percent to TNT and 33.3 percent to the "Dianna S. Fife Trust." The four other lines were simply left blank. Trampe then signed the agreement in the presence of a notary.

Fife objected to the admission of exhibits 3 and 4 on the grounds of foundation and unfair surprise. The court overruled the objections and admitted exhibits 3 and 4 into evidence.

### (b) Exhibit 1

Trampe testified that based on the letter and exhibit 4, he had created another document, exhibit 1, which provided in full:

Rowland Trampe owner and operator of TNT Cattle Co. Inc. agrees to rent the farm ground from Dianna Fife in section 26 T-10-N-R-17-W in Grant township. The lease period will go from January 2007 until December 2017 a ten year period. The ground will be rented on shares in corn and soybeans 66.7 percent to TNT Cattle Co. and 33.3 percent to Dianna Fife. Dianna will pay her share of the Fertilizer and TNT Cattle Co. will pay

his share of Fertilizer plus 100 percent of the herbicides and insecticides. Dianna will pay all bills for the repairs of the wells the pumps gear heads the pivot and her well motor.

### (c) Exhibits 1 and 4 Signed
### Simultaneously

Trampe testified that he signed both exhibit 1 and exhibit 4 in front of a notary on January 16, 2007, and the exhibits so reflect. Trampe testified that he mailed both documents to Fife together. Fife subsequently returned both documents to Trampe via the postal service, after signing them both in the presence of a notary on February 7, 2007.

Fife signed exhibit 1 "Dianna Fife," but signed exhibit 4 as "Dianna S. Fife Trust."

Fife could not specifically recall preparing or signing exhibit 4, but she verified that it was her signature on the document. Trampe testified that he received the signed documents back from Fife sometime around mid-February 2007.

### 3. Change of Crop to
### Organic Alfalfa

The lease arrangement continued without incident until 2015. Before the 2015 growing season commenced, Fife approached Trampe, expressing the desire to switch from the genetically modified row grain crop that was being grown on the Fife farm to organic alfalfa. Further, Fife expressed to Trampe that she no longer wished to contribute to any of the farming expenses.

Trampe explained that alfalfa seed is an expensive perennial and that switching to alfalfa from the row crops required more fieldwork and water. Furthermore, the first year of an alfalfa crop does not yield a good harvest. After the first year, the perennial crop produces a good yield for about 6 years.

Trampe testified that he believed he had at least 3 more years under the lease agreement to recoup his investment. In other words, they were simply modifying the agreement to

change the crop and the percentage shares of costs and profits, not the lease term. Trampe testified that he expected to have at least three cuttings of alfalfa in 2015 and four in 2016 and 2017. He would not have planted such an expensive crop at his own expense for only a 2-year lease.

Trampe proposed that they could split the profits 50-50 if Fife paid half of the farming expenses. If, on the other hand, Fife did not contribute to any of the farming expenses, she could receive one-third of the profits, while Trampe would retain two-thirds. According to Trampe, Fife told him that she wished to enter into the one-third arrangement where she would not incur any farming expenses.

TNT replowed and reconfigured the ground to allow for the production of alfalfa, planting the first new crop in the spring of 2015. Thereafter, TNT made three cuttings of alfalfa in 2015 and four in 2016, keeping two-thirds for himself and allocating the remaining one-third of the yield to Fife. The evidence was undisputed that Fife received one-third of the profits from these harvests.

## 4. Termination

### (a) Letter

Trampe testified that he received a letter from Fife in August 2016, in which Fife first communicated she might be looking for another tenant, and that she and Trampe had different ideas about the end date of the lease agreement. Trampe described that the letter stated Fife "had other offers to farm the ground." Fife described that she sent the letter in July 2016 and that in the letter, she notified Trampe that TNT's lease would terminate effective December 31, 2016. The letter was not in evidence.

### (b) Conversations

Trampe and Fife spoke on the telephone after Trampe received the letter. The court found that they discussed their disagreement as to when the lease period would end and "apparently negotiated through 2016 calendar year."

Trampe and Fife had a face-to-face meeting at a restaurant in Kearney, Nebraska, in September 2016. The exact date of the conversation is unclear. Trampe testified that during the conversation, he expressed his opinion that their lease agreement was until 2017:

[B]ut I said if it would help . . . , if you want a new contract—because she told me just give her a new bid on it. She wanted to go a three-year contract. So I thought about it and I did, I sent her a new proposal, assuming that if that was the case, well, I would be all right with that because planting the hay, I was hoping to get five or six years out of it where I incurred all the expenses, to kind of recoup some of those expenses.

Fife testified she told Trampe during this conversation that the 10-year lease would end on December 31, 2016, but that she had not entered into an agreement with anyone else and was "more than willing to have him send me a new contract starting in 2017." She did not recall Trampe's end of the conversation, but acknowledged that Trampe sent her some proposals afterward.

### (c) Negotiations for New
### Lease Unsuccessful

Ultimately, Fife did not accept Trampe's offer, because she had better bids. Trampe responded it would be hard to compete with other bidders who did not have to recoup an investment into the ground and who could take advantage of the seed he had planted.

### (d) Notice of Eviction

Trampe testified that at some later point, he received a letter from Fife telling him that "I needed to have my stuff or possession and/or shared payoff by December 31 of '16 or there would probably be a sheriff there to greet me if I was trespassing on her land, that she would consider it trespassing after December 31 of '16." By December 31, 2016, Trampe had removed himself and his belongings from the Fife farm.

5. Changing Theories of Recovery
and Ownership of Fife Farm

In its original complaint, TNT had sued Fife in her individual capacity and alleged that the parties' original lease agreement was represented in a singular ambiguous written instrument, exhibit 1, and that Fife breached the agreement when she demanded Trampe vacate the premises before the intended end date of the lease. In her answer to the original complaint, Fife admitted she was a nonresident landowner "possessed of and fee owner of" the Fife farm. Further, Fife's counterclaim alleged that "defendant" was the owner of the Fife farm. She attached to her counterclaim the warranty deed that conveyed the Fife farm to "Dianna S. Fife" in 2003. Fife did not sign the pleadings and was not present at the hearing on TNT's request for a temporary injunction. It was undisputed that although the "Dianna S. Fife Trust" (hereinafter Fife trust) existed when Fife and TNT entered into the long-term lease agreement, Fife held title to the Fife farm as an individual at that time.

But, at the July 2017 trial, both parties presented evidence that conflicted with the original pleadings. Fife was called by her counsel as a witness and testified that in September 2016, she had transferred the Fife farm into an irrevocable trust, the Fife trust, and that the Fife farm had remained in the Fife trust since that time. Fife described that she was the sole trustee but was not asked to provide any additional details about the Fife trust or its beneficiaries. No evidence was adduced as to the precise date of the transfer, and the deed itself is not in the record.

At the close of direct examination and before cross-examination of Fife, TNT asserted that Fife was precluded by the judicial admission in her answer and counterclaim to the original complaint from claiming she no longer owned the Fife farm. Despite Fife's counsel's objection that Fife had not signed or verified the answer and counterclaim, the court agreed and stated that the judicial admission controlled over the testimony at the hearing. The court denied a motion by

Fife's counsel to withdraw the admissions so as to conform to the evidence or, alternatively, to amend by interlineation.

But Trampe had also presented evidence of exhibit 4 as constituting part of the written lease agreement, which had not been pled. And a subsequent hearing was held on November 30, 2017, after TNT filed a motion seeking to amend its complaint to conform to the evidence that there were two writings forming the lease agreement instead of one. The proposed amended complaint still named Fife in her individual capacity as the only defendant.

Fife objected to the amended complaint on the ground of unfair surprise. The court allowed the amended complaint, but also allowed Fife to file an amended answer and counterclaim. Further, the court allowed the evidence to be reopened and held a continuation of the trial on November 30, 2017.

In her amended answer, Fife affirmatively alleged that the Fife farm "is owned by the [Fife trust] and that the trustee of said trust is . . . Fife." She did not change the allegation in her counterclaim that "[Fife] is the owner of the real estate . . . ." The court explicitly recognized both the amended complaint and the amended answer and counterclaim, explaining that the case was to "proceed on those documents at this point."

Neither the parties nor the judge discussed at the continuation of trial the fact that the operative answer alleged that the Fife trust owned the Fife farm and that Fife was no longer bound by her statements in the prior pleadings. TNT did not assert that any statement in Fife's amended answer was a judicial admission.

While Fife testified at the reopened trial telephonically, no further testimony was adduced pertaining to who or what entities would be directly affected by the judgment. Rather, Fife reiterated that when she asked Trampe for a copy of their agreement, Trampe sent her only exhibit 1. Fife also submitted evidence that the document found in exhibit 1 was the only document filed with the U.S. Department of Agriculture Farm Service Agency in June 2017.

There was no motion by Fife to dismiss for lack of an indispensable party, and there was no attempt by TNT to join in the action Fife in her capacity as trustee.

### 6. Order of December 2017

The court issued its order on liability in December 2017. In the prior hearing on temporary injunctive relief under the original complaint, the court had determined that the lease reflected in exhibit 1 was ambiguous. The court reiterated that determination in its December 2017 order deciding the questions of permanent injunctive relief, declaratory judgment, and breach of contract.

In determining Fife's liability, the court considered the evidence admitted at the three hearings on May 31, July 26, and November 30, 2017. The court opined that both Trampe and Fife were "poor historians," but that Trampe's recollection of events was clearer than Fife's. Thus, the court found "generally that . . . Trampe's recollection of events is the more credible."

The court considered exhibit 4 as an "additional document memorializing the lease agreement of the parties" and found that because exhibit 4 was partially prepared by Fife and both parties executed exhibit 1, "[b]oth are responsible for any ambiguity and lack of clarity that arises from these two documents."

The court ultimately concluded that it was "clear . . . that it was the parties' intention that the lease period would run from January 2007 until December 2017, an eleven-year farm lease." Further, the court rejected Fife's contention that the 11-year lease was terminated by virtue of the subsequent agreement to produce organic alfalfa on the Fife farm. In this regard, the court noted that Fife had relied on the 10-year language in exhibit 1 in asserting that TNT's tenancy was due to end. Thus, the court concluded that Fife had breached the lease agreement.

In its order, the court did not consider the question of when exactly the breach had occurred and whether any indispensable parties were missing from the action. The court appeared to

find that Fife was simultaneously the owner of the Fife farm and not the owner of it:

> Fife is a resident of the State of Washington *who owns* agricultural land located within Section 26, Township 10, Range 17 West of the 6th P.M. in Buffalo County, Nebraska. [Fife] purchased this land in her own name on January 20, 2003 from the Richard J. Cook Family Trust which she was then serving as Co-Trustee (Exhibit No. 5). *She has since transferred this land to her own family trust.*

(Emphasis supplied.)

The court found that by the time of the order, injunctive relief was moot. The court found in favor of TNT on its causes of action for declaratory relief and breach of contract, and the case proceeded for a determination of damages.

### 7. Damages

The joint pretrial conference memorandum clarified that the hearing was to determine the amount of damages sustained as a result of the loss of the hay crop that would have been harvested from the Fife farm during the 2017 crop year. Trampe had previously testified that he had last harvested alfalfa from the Fife farm in the fall of 2016.

### (a) Yield and Market Value

At the trial on damages, Trampe testified that he had been farming alfalfa and other crops for approximately 40 years. Trampe testified that in his experience in farming alfalfa on the type of ground that the Fife farm consisted of, the normal range of expected production would be 8 to 10 tons per acre on irrigated land and around 5 tons on dryland. Production on the Fife farm was close to average, though "it might have been a touch lower because it was new hay." Trampe testified that he farmed 29.14 dry acres on the Fife farm and 130.8 "irrigated acres." Approximately 86 of the irrigated acres were irrigated by the pivot, while the remaining 44 certified irrigated acres had been irrigated through a gravity irrigation

system. Trampe, however, did not irrigate those acres in 2015 and 2016.

TNT admitted into evidence receipt for the sale on January 24, 2017, of some alfalfa that had been grown in 2016 from different harvests. It was not all of the crop he had grown and harvested in 2016. He received $85 per ton. At the hearing for a temporary injunction, Trampe had said that he fed 90 percent of his alfalfa bales from the Fife farm to his cattle, but it was unclear what time period Trampe was referring to. Trampe did not sell alfalfa in 2017, because he used all his hay to feed his cattle.

Trampe testified that he was familiar with the alfalfa hay market in 2018, in which farmers were selling their 2017 harvests. Trampe said that the price of alfalfa had risen to a range of $90 to $100 per ton.

Trampe had expected a full growing season of alfalfa to yield an average harvest, or "cuttings," of 8.6 tons per acre. Trampe testified that, generally, the density and weight of the bales increased from the first to the last cuttings of the season. Thus, a bale from the first harvest would average 1,425 pounds, a bale from the second harvest would average 1,475 pounds, a bale from the third harvest would average 1,500 pounds, and a bale from the fourth harvest would average 1,700 pounds.

A farmer in the same area who was the current tenant of the Fife farm testified that in 2016, he had purchased from Fife 380 bales of alfalfa harvested from the Fife farm. The average weight per bale ranged from 1,366 to 1,685 pounds. He paid $65 per ton. He testified that prices rose the following year. In 2017, alfalfa of the sort grown on the Fife farm sold for $85 per ton.

### (b) Lost Farm Program Payment

Trampe testified that every year, it was his normal practice to apply for farm program payments by certifying the acres each year. Trampe had always certified the acres on Fife's behalf through the exercise of a power of attorney she had given him. Though there were initially complications, Trampe

was ultimately able to receive the farm program payment for 2016. He had also received a farm program payment in 2015. For both years, the amount of the payment was approximately $3,460. Despite acknowledging that 2017 was governed by a new farm bill, Trampe was unaware of any reason why he would not have received the farm program payment for 2017 had he been allowed to farm the Fife farm that year.

### (c) Expenses

#### (i) Seed

Trampe testified that he paid $14,300 for the alfalfa seed that he planted in 2015.

#### (ii) Fertilizer

Trampe spent $8,280 on a combination of annual fertilizer and a starter fertilizer. In 2016, Trampe hauled and spread his own cattle's manure onto the Fife farm as fertilizer. He did not give an estimate as to what that fertilizer was worth, and he did not recall what any transportation costs were. Trampe testified that he would have fertilized the Fife farm for the 2017 crop year, but obviously did not. A "rough guess" of the cost of fertilizer was $40 to $45 per acre.

#### (iii) Pivot Operation

TNT paid the electric bills pertaining to the operation of the pivot irrigation system on the Fife farm. Those bills were $3,337.21 for 2015 and $3,424.63 for 2016. Based on his experience in 2017 farming other properties, Trampe believed that the electric company had increased its rates between 2016 and 2017 by about 4 to 6 percent. Trampe also spent about $100 per year in drip oil for the pivot irrigation system.

#### (iv) Swathing, Raking, Baling, and Loading

Trampe testified that there are a number of expenses relating to harvesting. Operating swathers, tractor-pulled rakes and balers, and loaders requires fuel. Trampe testified that

per harvest of the Fife farm's 130 acres of irrigated land, he used a 120-gallon tank of fuel to operate the swather. Raking the same land consumed approximately 26 gallons of fuel per harvest. Baling the same field consumed approximately 55 gallons of fuel per harvest. In addition, the netting for the bales costs $200 a roll, with each roll wrapping about 125 bales of the 6-foot-tall bales that Trampe made. Each bale, Trampe testified, weighed about 1,500 pounds. The loading process required 13 or 14 gallons of fuel per harvest of the 130 irrigated acres. Two fuel bills in October 2017 demonstrated that farm diesel was priced at approximately $2.10 and that clear diesel was priced at $2.60 per gallon. Trampe testified that a normal farm year for alfalfa consisted of four harvests.

A witness called by Fife who specializes in hay production and transportation for third-party clients testified that in 2017, his business charged $15 per acre of alfalfa to swath and rake it, $15 per bale of alfalfa to bale it, and $2 per bale to move it to the edge of the field for the customer. The witness opined that those prices were fair and reasonable for the Buffalo County area. The Fife farm's current tenant testified that he agreed that those prices were fair and reasonable for the Buffalo County area.

### (v) Vehicle and Equipment Maintenance

Trampe testified that he had to service his two tractors approximately every 200 hours of use. In addition to the Fife farm's 159 acres, Trampe farmed 1,200 other acres of land. He serviced his tractors three or four times per year at a cost of approximately $100 per service, not including labor. Trampe did not determine how many hours his equipment had been used on the Fife farm versus the other acres he farmed.

Trampe also had his two balers inspected and serviced every 3 years. The balers were used only on the Fife farm and 70 acres of Trampe's own land. He estimated that one-third of the total usage was on the Fife farm. He had the balers serviced in 2016 for approximately $9,000.

(d) September 2018 Order on Damages

In an order on September 24, 2018, the court found that at the beginning of the 2017 crop year, TNT "was anticipating the production of a crop that was just about to reach its peak productivity." Further, "TNT's discovery efforts to obtain records of alfalfa production on the Fife [f]arm during 2017 from . . . Fife was wholly unproductive," because Fife kept no records. This left TNT "in the unenviable position of having to project the anticipated yield using sources of information other than records of the actual yield itself."

Utilizing the testimony and evidence submitted by TNT, the court calculated that there were 85 acres of "actually" irrigated ground, which would have yielded 731 tons of hay (8.6 tons per acre of expected production). Further, there were 74 acres of nonirrigated ground that would have yielded 370 tons of hay (5 tons per acre of nonirrigated ground).

While the court noted that Fife has admitted evidence that her one-third crop share from the Fife farm in 2016 was only 286.55 tons, such yield was from the second year of production, not the third year, in which a higher yield was expected. Moreover, the court found that Fife,

having failed to produce any records whatsoever of the actual production of hay from the Fife [f]arm in question in 2017, a year in which the Fife [f]arm was totally under her control cannot, in the Court's opinion, persuasively argue that she is being treated unfairly if the Court accepts . . . Trampe's opinion as to the expected yield in 2017.

The court found that alfalfa in 2017 was worth $85 per ton. Thus, Trampe had shown that the 2017 farm year would have produced a total of $93,585 in gross profits from the land.

As expenses, the court calculated $6,757.50 for fertilizer; $100 for oil for the pivot; $3,549.96 in electricity for the pivot (based on a 5-percent increase in rates); $1,823.28 in fuel costs for swathing, raking, baling, and stacking; and $2,388 in net wrap.

The court rejected Fife's contention that the alfalfa seed cost should be prorated and also deducted from the damages calculation. The court explained:

> TNT . . . sustained this one-time seed expense expecting receipt of the benefit of this investment over the entire productive life of this perennial crop. . . . Fife's termination of the lease a year early in 2017, not only damaged TNT . . . in its loss of profits in 2017, but kept it from recovering the benefits of its seed investment over the full cycle in which this perennial crop would have been expected to produce economically harvestable hay. . . . Its seed cost/investment amounted to a one-time overhead expense. It should not be subjected to further loss in 2017 by charging it with prorated portion of this overhead again.

The court also rejected Fife's argument that Trampe's costs should include costs of transporting machinery to and from the Fife farm and of transporting alfalfa to market or to Trampe's land to feed his cattle and that the failure to adduce evidence of transportation costs rendered any damages calculation speculative. The court explained that transportation costs between the Fife farm and Trampe's cattle operation a short distance away was part of the expected overhead of the cattle operation and that there was no evidence that cost was saved in 2017 rather than used to raise, harvest, or transport other feed or hay. Whatever transportation costs Trampe would have incurred had likely actually been incurred: "The cost of transporting the replacement feed it used in 2017 has already been paid."

Relying on *ACI Worldwide Corp. v. Baldwin Hackett & Meeks*,[1] the court found that fixed overhead expenses, such as TNT's costs to inspect and maintain its equipment over the full breadth of its farm operations, need not be deducted from gross income to arrive at the net profit properly recoverable.

---

[1] *ACI Worldwide Corp. v. Baldwin Hackett & Meeks*, 296 Neb. 818, 896 N.W.2d 156 (2017).

Thus, deducting a total of $14,518.74 in expenses from TNT's two-thirds share in the 2017 expected profits, the court found a total loss of net profits in the amount of $47,821.26.

The court then added $3,461 in the lost 2017 farm program payment. The court explained that at the time of the trial on damages, the federal farm program benefits for 2017 had not yet been calculated by the U.S. Department of Agriculture Farm Service Agency, but "there is nothing to suggest that Congress will change the existing farm program."

The court awarded TNT a total of $51,332.26 in damages, plus costs. Following the court's denial of her motion for new trial, Fife timely appealed.

## III. ASSIGNMENTS OF ERROR

Fife assigns that the trial court erred in (1) awarding TNT a money judgment against her when she did not own the Fife farm and was not the landlord, (2) failing to find that the written lease agreement was terminated and became a year-to-year oral lease agreement beginning in 2015 and thus was properly terminated by written notice, (3) determining that the written lease agreement was for 11 years rather than 10 years, and (4) awarding $51,332.26 based upon speculative evidence.

## IV. STANDARD OF REVIEW

[1] An action for declaratory judgment is sui generis; whether such action is to be treated as one at law or one in equity is to be determined by the nature of the dispute.[2]

[2] In appellate review of an action for a declaratory judgment in a law action, factual findings by the trier of fact will not be set aside unless such findings are clearly erroneous.[3]

---

[2] *American Amusements Co. v. Nebraska Dept. of Rev.*, 282 Neb. 908, 807 N.W.2d 492 (2011).

[3] *State ex rel. Spire v. Northwestern Bell Tel. Co.*, 233 Neb. 262, 445 N.W.2d 284 (1989).

[3] An action for breach of a lease agreement is an action at law.[4]

[4] Factual findings in a court's determination of a factual challenge to subject matter jurisdiction are reviewed under a clearly erroneous standard.[5]

## V. ANALYSIS

### 1. Indispensable Party Question

[5] We first address the threshold question of whether TNT's action lacked an indispensable party. Fife asserts that the evidence was undisputed that the Fife farm had been transferred to the Fife trust by the time of the alleged breach. Thus, Fife asserts that in her capacity as trustee, she was an indispensable party to TNT's action for damages and declaratory judgment based on breach of contract and the court lacked jurisdiction over TNT's claims when she was named only in her individual capacity. An indispensable party to a suit is one whose interest in the subject matter of the controversy is such that the controversy cannot be finally adjudicated without affecting the indispensable party's interest, or which is such that not to address the interest of the indispensable party would leave the controversy in such a condition that its final determination may be wholly inconsistent with equity and good conscience.[6]

[6] Neb. Rev. Stat. § 25-323 (Reissue 2016) mandates that indispensable parties be joined in an action, stating in relevant part that "when a determination of the controversy cannot be had without the presence of other parties, the court must order

---

[4] See, *Caeli Assoc. v. Firestone Tire & Rubber Co.*, 226 Neb. 752, 415 N.W.2d 116 (1987); *Quinn v. Godfather's Investments*, 213 Neb. 665, 330 N.W.2d 921 (1983).

[5] See *Jacobs Engr. Group v. ConAgra Foods*, 301 Neb. 38, 917 N.W.2d 435 (2018).

[6] *Midwest Renewable Energy v. American Engr. Testing*, 296 Neb. 73, 894 N.W.2d 221 (2017).

them to be brought in."[7] Section 25-323 deprives a court of the authority to determine a controversy absent all indispensable parties and cannot be waived.[8]

[7] The burden of procuring the presence of all indispensable parties is on the plaintiff.[9] This burden is similar to the burden to establish other factual matters that the court's subject matter jurisdiction depends upon.[10] The party invoking the court's jurisdiction ordinarily has the burden of proving by a preponderance of the evidence the necessary facts for subject matter jurisdiction.[11]

Fife and TNT disagree as a factual matter whether the Fife farm belonged to the Fife trust when the events occurred that TNT sought to litigate. The relevant time period for the cause of action for breach of contract and declaratory relief tried below is when the breach occurred.[12] Though TNT originally pled injunctive relief, that claim was moot by the time of trial and the case was tried as an action at law under the alleged lease contract.

[8,9] Ordinarily, there is no breach until the time for performance.[13] While TNT's operative complaint alleged anticipatory breach, such was not the theory upon which the case was tried. An anticipatory breach of contract is one committed before the time has come when there is a present duty of

---

[7] See *id.* See, also, Neb. Rev. Stat. § 25-21,159 (Reissue 2016).

[8] See *Midwest Renewable Energy v. American Engr. Testing, supra* note 6.

[9] See *Pestal v. Malone*, 275 Neb. 891, 750 N.W.2d 350 (2008).

[10] See, *Jacobs Engr. Group v. ConAgra Foods, supra* note 5; *Rozsnyai v. Svacek*, 272 Neb. 567, 723 N.W.2d 329 (2006). But see *Davis v. State*, 297 Neb. 955, 902 N.W.2d 165 (2017).

[11] See 61A Am. Jur. 2d *Pleading* § 506 (2010).

[12] See *Hooker and Heft v. Estate of Weinberger*, 203 Neb. 674, 279 N.W.2d 849 (1979).

[13] See, *Reichert v. Rubloff Hammond, L.L.C.*, 264 Neb. 16, 645 N.W.2d 519 (2002); *Phipps v. Skyview Farms*, 259 Neb. 492, 610 N.W.2d 723 (2000); 1 Howard O. Hunter, Modern Law of Contracts, § 12:1 (2019).

performance and is the outcome of words or acts evincing an unequivocal repudiation of the contract.[14] This is distinguishable from a disagreement about the interpretation or meaning of a term in a contract.[15] When there is an anticipatory breach, the promisee has the option to treat the contract as ended so far as further performance is concerned and maintain an action immediately rather than await the promisor's time for performance.[16] TNT did not cease to pay rent and sue Fife immediately when it became apparent that they disagreed as to the meaning of the duration terms of their lease agreement. Rather, TNT sued Fife after she gave notice of eviction, and the trial commenced after Fife had evicted TNT. The case was tried on the ground that by evicting TNT, Fife had breached the implied term of quiet enjoyment that was part of her ongoing duty of performance under a lease term that had not yet ended.

[10,11] TNT does not contest that the operative period of time for the action was the eviction in December 2016, but points out that the district court found by judicial admission that the Fife farm still belonged to Fife in her individual capacity in December 2016. At TNT's request, the court had acknowledged from Fife's original answer and

---

[14] See, *Weber v. North Loup River Pub. Power*, 288 Neb. 959, 854 N.W.2d 263 (2014); *Chadd v. Midwest Franchise Corp.*, 226 Neb. 502, 412 N.W.2d 453 (1987).

[15] See, *Hughes v. Cornhusker Cas. Co.*, 235 Neb. 656, 456 N.W.2d 765 (1990); 1 Hunter, *supra* note 13. See, also, *Mobley v. N. Y. Life Ins. Co.*, 295 U.S. 632, 55 S. Ct. 876, 79 L. Ed. 1621 (1935); *Trans Union Credit Info. v. Assoc. Credit Services*, 805 F.2d 188 (6th Cir. 1986); *American Hosp. Supply v. Hospital Products Ltd.*, 780 F.2d 589 (7th Cir. 1986); *Pacific Coast Eng. Co. v. Merritt-Chapman & Scott Corp.*, 411 F.2d 889 (9th Cir. 1969); *Lowenstein v. Federal Rubber Co.*, 85 F.2d 129 (8th Cir. 1936); *Kimel v. Missouri State Life Ins. Co.*, 71 F.2d 921 (10th Cir. 1934); 17A Am. Jur. 2d *Contracts* § 686 (2016).

[16] See *Hooker and Heft v. Estate of Weinberger, supra* note 12. See, also, 23 Richard A. Lord, A Treatise on the Law of Contracts by Samuel Williston § 63:33 (4th ed. 2018).

counterclaim to the original complaint a judicial admission that she "owned" the Fife farm as an individual. Fife testified at the trial that she had transferred the Fife farm to the Fife trust in September 2016, but the court had originally refused to consider this testimony that contradicted her judicial admission. A party may at any and all times invoke the language of his opponent's pleadings on which the case is being tried on a particular issue as rendering certain facts indisputable.[17] The pleadings in a cause are not a means of evidence, but a waiver of all controversy, so far as the opponent may desire to take advantage of them, and therefore, a limitation of the issues.[18]

However, after the court acknowledged as judicial admissions Fife's statements in her original pleadings, it allowed TNT to amend its complaint. The court also permitted Fife to amend her answer. When she did so, she no longer admitted to TNT's allegation that she owned the Fife farm. Rather, in her amended answer, Fife affirmatively alleged that the Fife farm was owned by the Fife trust. The court then reopened and continued the trial in which Fife had testified that she had transferred the Fife farm into the Fife trust.

[12,13] Statements in pleadings remain binding only until the pleading is amended.[19] Matters contained in superseded pleadings are simple admissions that are admissible as evidence of the facts alleged therein and may be introduced and considered the same as any other evidence.[20] Such original pleading is not conclusive evidence, but competent, as any other admission of a party against interest, and should be given such weight as the trier of fact deems it entitled in the light of

[17] See *Cook v. Beermann*, 201 Neb. 675, 271 N.W.2d 459 (1978).

[18] See *Prime Home Care v. Pathways to Compassion*, 283 Neb. 77, 809 N.W.2d 751 (2012).

[19] See *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224 (9th Cir. 1988).

[20] See, *Sturzenegger v. Father Flanagan's Boys' Home*, 276 Neb. 327, 754 N.W.2d 406 (2008); *Cook v. Beermann, supra* note 17.

the pleader's explanation, if any, of the circumstances under which the admissions were made.[21]

At no point after Fife's original answer and counterclaim were superseded did TNT offer them into evidence as an ordinary admission to be weighed in considering the question of the ownership of the Fife farm as of September 2016. Since TNT did not offer the original answer or counterclaim as evidence to be considered in the continuation of the trial under the amended pleadings, Fife's testimony that the Fife farm was owned by the Fife trust as of September 2016 was undisputed.

[14] It is true that the amended counterclaim remained unchanged insofar as it stated the "defendant" was the owner of the subject real estate, but TNT did not seek to rely on the amended counterclaim as either a simple admission or a judicial admission. The consideration of admissions is at the option of the opposing party.[22] Furthermore, this statement in the amended counterclaim in the context of the amended answer to which it was attached did not qualify as a judicial admission. A judicial admission does not extend beyond the intendment of the admission as clearly disclosed by its context[23] and must be unequivocal, deliberate, and clear, and not the product of mistake or inadvertence.[24] In light of the clear statement in the amended answer that the Fife farm had been transferred to the Fife trust, the unchanged statement in the counterclaim that "[d]efendant is" the owner of the Fife farm was not unequivocal, deliberate, and clear, but instead appears to be the product of mistake or inadvertence.

The district court did not ultimately find as a factual matter that Fife continued to own the Fife farm. It is true that the

---

[21] *Johnson v. Griepenstroh*, 150 Neb. 126, 33 N.W.2d 549 (1948).

[22] See, *Prime Home Care v. Pathways to Compassion, supra* note 18; *Cook v. Beermann, supra* note 17.

[23] *Cervantes v. Omaha Steel Castings Co.*, 20 Neb. App. 695, 831 N.W.2d 709 (2013).

[24] *Wisner v. Vandelay Investments*, 300 Neb. 825, 916 N.W.2d 698 (2018).

court stated in its order that Fife "is" a Washington resident who "owns" the Fife farm, but it also found that "[s]he has since transferred this land to her own family trust." The confusing nature of the verb tenses notwithstanding, it appears the court found that at some unspecified point in time before its order, the ownership of the Fife farm was transferred to the Fife trust. This finding was not clearly erroneous.

The question thus becomes whether Fife is correct that because she no longer owned the Fife farm when she evicted TNT, and was allegedly acting instead in her capacity as sole trustee for the Fife trust, which owned the land at that time, Fife in her capacity as trustee was an indispensable party to TNT's action. We conclude that Fife in her capacity as trustee of the Fife trust was not an indispensable party.

At the time of the breach, the lease implicated principles of both privity of contract and privity of estate.[25] Fife relies on our statements in other contexts that a suit must be brought by or against a person or persons who have an interest in the property and will be affected by the order of the court[26] and that parties to whom or from whom contractual obligations are jointly owed are indispensable parties to actions concerning contractual obligations.[27] These propositions are inapposite to the case at bar. The transfer of the Fife farm to the Fife trust meant that privity of estate was transferred to the Fife trust, while privity of contract remained with Fife as the individual who entered into the lease agreement with TNT. Privity of contract is not transmitted to the purchaser of a leasehold.[28]

---

[25] See *Brick Development v. CNBT II*, 301 Neb. 279, 918 N.W.2d 824 (2018).

[26] See *Ruzicka v. Ruzicka*, 262 Neb. 824, 635 N.W.2d 528 (2001).

[27] See, *Hecker v. Ravenna Bank*, 237 Neb. 810, 468 N.W.2d 88 (1991); *Wolfenbarger v. Britt*, 105 Neb. 773, 181 N.W. 932 (1921); *Harker v. Burbank*, 68 Neb. 85, 93 N.W. 949 (1903); *Council Bluffs Savings Bank v. Griswold*, 50 Neb. 753, 70 N.W. 376 (1897); *Bowen v. Crow*, 16 Neb. 556, 20 N.W. 850 (1884).

[28] *Brick Development v. CNBT II, supra* note 25.

[15,16] A transferor of an interest in leased property, who immediately before the transfer is obligated to perform an express or implied promise of the lease resting on privity of contract, continues to be obligated after the transfer.[29] Specifically, a landlord who has transferred his or her interest in the land remains liable under a lease agreement, on the implied promise of quiet enjoyment, for disturbances of the tenant by the former landlord himself or herself or by someone whose conduct is attributable to the former landlord.[30] It was under this theory that the case was tried. The evidence presented was that Fife held herself out as an individual with authority to evict TNT from the land, causing TNT to vacate the Fife farm, thereby breaching Fife's implied promise, as an individual, not to disturb TNT's right to quiet enjoyment for the duration of the lease period.

Although a covenant of continuing quiet enjoyment would run with the land under privity of estate to the Fife trust as the new owner of the Fife farm, the alleged act of eviction by Fife in her individual capacity was not an act of joint liability with Fife in her official capacity. Neither does the judgment against Fife in her individual capacity affect the person or persons who have an interest in the property since its transfer into the Fife trust. The transferor landlord is liable under privity of contract for the transferor's acts interfering with quiet enjoyment, while the transferee landlord is liable under privity of estate for the transferee's acts interfering with quiet enjoyment.[31] The determination of one does not affect the interests of the other, nor would it leave the controversy in such a condition that its final determination may be wholly inconsistent with equity and good conscience.[32]

---

[29] See 2 Restatement (Second) of Property: Landlord and Tenant §§ 16.1 and 16.3 (1977).

[30] See 2 Restatement (Second), *supra* note 29, § 16.3.

[31] See *id.*

[32] See *Midwest Renewable Energy v. American Engr. Testing, supra* note 6.

The present situation is admittedly unique because the transferor and the agent of the transferee are the same person in different capacities. And it is true that a principal is under a duty to reimburse its agent for payment of damages which the agent is required to make to a third person on account of the authorized performance of an act which constitutes a tort or breach of contract. But the trial below did not litigate whether Fife was secretly acting in her authorized capacity on behalf of the Fife trust when she evicted TNT.

In sum, Fife is correct that she demonstrated she did not personally own the Fife farm when the breach occurred that formed the basis for TNT's action. Nevertheless, under privity of contract, she was a proper defendant in TNT's action for breach of contract and related declaratory judgment action stemming from her act of evicting TNT. Fife in her capacity as trustee of the Fife trust was not an indispensable party regardless of whether Fife can later prove that she was, undisclosed to TNT, acting at the time of the eviction on behalf of the Fife trust. The lower court had jurisdiction to issue the challenged judgment. We turn next to the underlying merits of the appeal.

## 2. Underlying Merits

Fife argues on appeal that the district court erred in concluding that the lease agreement was for 11 years, ending in December 2017, instead of concluding that it was for 10 years, ending in December 2016. Alternatively, Fife asserts the district court erred by failing to conclude that the written long-term lease had been rescinded due to an oral modification and that the parties were operating under an oral year-to-year lease at the time of the alleged breach.

[17,18] Where the terms of a written lease appear to be ambiguous and uncertain as to the intended length of the tenancy or the beginning or end of the term, then, as in other cases of ambiguity, parol evidence may properly be resorted to for the purpose of resolving the uncertainty and explaining

the parties' true intentions in that respect.[33] Further, instruments made in reference to and as part of the same transaction are to be considered and construed together.[34]

Fife argues that the court's conclusion that the lease agreement was for 11 years was the result of improperly considering exhibits 3 and 4 together with exhibit 1. But Fife does not assign and argue as error that exhibits 3 and 4 were improperly admitted, and an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.[35]

Fife merely offers the conclusory statement that "[t]he court's consideration of Exhibit 3 and Exhibit 4 was improper in light of the testimony of [Trampe]" that it was his intention that the farm lease would last for 10 years.[36] Fife has taken this testimony out of context. Trampe testified that he understood that the 10 years would begin once the irrigation pivot was in place, which was not until 2008.

[19] Exhibit 4, which was signed by both Fife and TNT, provided unambiguously that the lease agreement was until December 2017. Exhibit 1 is less clear in its statement that the "lease period will go from January 2007 until December 2017 a ten year period," and this phrase renders the agreement embodied by the two documents ambiguous. When a document is ambiguous, it is for the trier of fact to determine the intent of the parties from all the facts and circumstances, and such findings will be upheld on appeal unless they are clearly erroneous.[37]

---

[33] See, *Nebraska Depository Inst. Guar. Corp. v. Stastny*, 243 Neb. 36, 497 N.W.2d 657 (1993); Annot., 151 A.L.R. 279 (1944).

[34] *Norwest Corp. v. State*, 253 Neb. 574, 571 N.W.2d 628 (1997).

[35] *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019).

[36] Brief for appellant at 18.

[37] See *Hensman v. Parsons*, 235 Neb. 872, 458 N.W.2d 199 (1990). See, also, e.g., *Wurst v. Blue River Bank*, 235 Neb. 197, 454 N.W.2d 665 (1990).

The district court's finding that the parties intended the lease to end in December 2017 was not clearly erroneous. The court found that Trampe's recollection of events was more credible than Fife's, and Trampe testified that it was their intent for the lease to end in December 2017. The documents read together also support the district court's conclusion that TNT and Fife intended the lease to end in December 2017. The "December 2017" end date is consistent with the December 2017 end date specified in exhibit 4, and it is the more specific term in exhibit 1 that controls over the characterization of "a ten year period."[38]

[20,21] Likewise, we find no error in the district court's conclusion that the parties did not intend to rescind their long-term lease agreement ending in December 2017 when they orally agreed in 2015 to change their arrangement with regard to the crops to be grown by TNT on the Fife farm. Rescission of contract means to abrogate, annul, avoid, or cancel a contract; particularly, nullifying a contract by the act of a party.[39] A "rescission" amounts to the unmaking of a contract.[40] The cancellation, abandonment, or rescission of a written contract may not only be written, but it may also be oral.[41] As opposed to rescission, a modification continues the original contract with some changes.[42] The terms of a written executory contract may be changed by a subsequent parol agreement prior to any breach of such contract.[43]

---

[38] See *Hans v. Lucas*, 270 Neb. 421, 703 N.W.2d 880 (2005).

[39] *Hoeft v. Five Points Bank*, 248 Neb. 772, 539 N.W.2d 637 (1995).

[40] *Id.*

[41] *Davco Realty Co. v. Picnic Foods, Inc.*, 198 Neb. 193, 252 N.W.2d 142 (1977).

[42] See 2A David Frisch, Lawrence's Anderson on the Uniform Commercial Code § 2-209:59 (3d ed. 2013).

[43] *Atokad Ag. & Racing v. Governors of Knts. of Ak-Sar-Ben*, 237 Neb. 317, 466 N.W.2d 73 (1991), *overruled on other grounds, Eccleston v. Chait*, 241 Neb. 961, 492 N.W.2d 860 (1992).

[22,23] In determining whether a rescission took place, courts look not only to the language of the parties but to all the circumstances.[44] Mutual rescission of a contract must be clear, positive, unequivocal, and decisive, and it must manifest the parties' actual intent to abandon their contract rights.[45]

Fife did not present clear and unequivocal evidence that she and Trampe intended to abandon all rights under the written long-term lease agreement. Trampe testified that he would not have agreed to invest in planting organic alfalfa without the assurance under the written lease that he had three full crop years to recoup his investment. Further, Fife relied on the "ten year" language of the long-term lease agreement when giving TNT notice of termination. The district court correctly found the evidence demonstrated that Trampe and Fife intended to orally modify their long-term written lease agreement to change the crops grown and their respective shares and expenses and that they intended to leave unchanged the other provisions of their agreement, including its duration.

It is undisputed that Fife evicted TNT in December 2016, prior to the December 2017 end date of the lease agreement. She sent Trampe a letter warning him that if he did not vacate the Fife farm by December 31, 2016, he would be considered trespassing. TNT accordingly removed its possessions and ceased operations on the Fife farm by that time. The district court did not err in finding that Fife thereby breached the lease agreement.

### 3. Damages

Fife argues that even if the court were correct in finding her liable, it erred in the amount of damages awarded. She generally asserts in this regard that the award of $51,332.26 was based on speculative evidence. We disagree.

---

[44] *Hoeft v. Five Points Bank, supra* note 39.

[45] 17B C.J.S. *Contracts* § 585 (2011).

[24,25] In a breach of contract case, the ultimate objective of a damages award is to put the injured party in the same position the injured party would have occupied if the contract had been performed, that is, to make the injured party whole.[46] One injured by a breach of contract is entitled to recover all its damages, including the gains prevented as well as the losses sustained, provided the damages are reasonably certain and such as might be expected to follow the breach.[47]

[26-28] While damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural.[48] Uncertainty as to the fact of whether damages were sustained at all is fatal to recovery, but uncertainty to amount is not if the evidence furnishes a reasonably certain factual basis for computation of the probable loss.[49] The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved.[50]

In evaluating the evidence of damages in this case, the court noted that although Fife and her new tenant had harvested in 2017 the alfalfa planted by TNT, TNT's discovery efforts to obtain records of the alfalfa production on the Fife farm in 2017 were wholly unproductive. This left TNT "in the unenviable position of having to project the anticipated yield using sources of information other than records of the actual yield itself."

---

[46] *Gary's Implement v. Bridgeport Tractor Parts*, 281 Neb. 281, 799 N.W.2d 249 (2011).

[47] *Id.*

[48] *Id.*

[49] *Sack Bros. v. Great Plains Co-op*, 260 Neb. 292, 616 N.W.2d 796 (2000); *Union Ins. Co. v. Land and Sky, Inc.*, 253 Neb. 184, 568 N.W.2d 908 (1997).

[50] *Dutton-Lainson Co. v. Continental Ins. Co.*, 279 Neb. 365, 778 N.W.2d 433 (2010).

Fife takes issue with TNT's proof in its efforts at making such projections. First, Fife asserts that the district court erred by accepting Trampe's testimony that TNT would have produced 1,101 tons of alfalfa had he been allowed to stay on the land for the 2017 crop year. Fife argues that the district court erred by accepting Trampe's testimony "based solely upon [his] farming experience without foundation for the opinion."[51] However, Fife did not object to this testimony during the trial. A litigant's failure to make a timely objection waives the right to assert prejudicial error on appeal.[52] It was not unreasonable for the court to accept Trampe's calculation over the evidence submitted by Fife of the yield produced on the Fife farm in 2016, when, in 2016, the alfalfa crop was only in its second year of production, and Trampe testified that the second year of production would ordinarily produce a smaller yield than the third year of production.

Second, Fife asserts that the court erred in applying alfalfa's 2017 market value to the damages calculation, because Trampe testified that in 2017, he fed all the alfalfa he produced on other farmland to his cattle. According to Fife, because he fed alfalfa to his cattle, it was necessary for Trampe to present evidence "as to the economic impact feeding one's own alfalfa has on the impact of his cattle production."[53] Fife does not explain why the absence of such evidence rendered the damages calculation speculative. We find that it was not unreasonable for the district court to base damages on the lost market value of the lost crops, whether or not Trampe would have fed the 2017 alfalfa yield to his cattle.

Third, Fife asserts that the district court did not properly deduct from its damages calculation the costs of production, specifically, seed costs and transportation costs. The seed costs

---

[51] Brief for appellant at 20.

[52] *Ford v. Estate of Clinton*, 265 Neb. 285, 656 N.W.2d 606 (2003).

[53] Brief for appellant at 21.

were incurred in 2015, but Fife argues that the court should have prorated that expense over the 3 years that remained of the lease from the time of the modification to organic alfalfa. The district court rejected this argument, reasoning that prorating the seed expense would exacerbate the loss to TNT resulting from the premature eviction that prevented TNT from recovering the benefits of its one-time seed investment over the expected 3-year alfalfa cycle. We find no error in this determination.

Likewise, the court's failure to deduct the transportation costs was not unreasonable. As the district court noted, those costs were incurred as part of TNT's normal overhead for its cattle operation, and the cost of transporting replacement feed used in 2017 had already been paid by TNT. There was no evidence that transportation costs were saved rather than used to raise and transport replacement feed. Such fixed overhead expenses need not be deducted from gross income to arrive at the net profit properly recoverable.[54]

Lastly, Fife asserts that the court erred by adding to TNT's damages calculation the lost benefit of his anticipated 2017 farm subsidy. Fife points out that the subsidy had not yet been approved at the time of trial. Trampe testified, however, that TNT's application for the subsidy had been approved in all the prior years on the Fife farm. It was not unduly speculative and conjectural for the court to conclude that TNT would have received this subsidy in 2017 as well.

We find no merit to Fife's contention that the amount of the district court's damages award was based on speculative and conjectural evidence. Rather, the district court's decision was supported by the evidence and bore a reasonable relationship to the elements of the damages proved.

## VI. CONCLUSION

The district court did not lack jurisdiction over the action brought by TNT against Fife solely in her individual capacity.

---

[54] See *ACI Worldwide Corp. v. Baldwin Hackett & Meeks, supra* note 1.

We affirm the district court's judgment finding that the lease agreement between Fife and TNT was for a period of 11 years, that the agreement was not rescinded by the parties' modification in 2015 of the crops to be grown on the land, and that TNT suffered $51,332.26 in damages as a result of Fife's evicting TNT from the Fife farm a year early.

Affirmed.