IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

TROTTER, INC. V. JACQUOT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

TROTTER, INC. AND JAMES A. TROTTER, TRUSTEE OF THE JAMES A. TROTTER
LIVING REVOCABLE TRUST, APPELLEES,
V.
ALAN J. JACQUOT AND ALLISON A. JACQUOT, APPELLANTS.

CEK INVESTMENT PROPERTIES, L.L.C., APPELLEE,
V.
ALAN J. JACQUOT, ALLISON A. JACQUOT, AND ALAN JAMES JACQUOT, TRUSTEE OF THE
MICHAEL PAUL JACQUOT TRUST, APPELLANTS.

LOIS-JACQUOT FARM CO., L.L.C., APPELLEE,
V.
ALAN J. JACQUOT, ALLISON A. JACQUOT, AND ALAN JAMES JACQUOT, TRUSTEE OF THE
MICHAEL PAUL JACQUOT TRUST, APPELLANTS.

ALAN J. JACQUOT, ALLISON A. JACQUOT, AND ALAN JAMES JACQUOT, TRUSTEE OF THE
MICHAEL PAUL JACQUOT TRUST, APPELLANTS,
V.
TROTTER, INCORPORATED, DOING BUSINESS AS TROTTER, INC.; JAMES A. TROTTER, TRUSTEE;
LOIS-JACQUOT FARM CO., L.L.C.; AND CEK INVESTMENT PROPERTIES, L.L.C., APPELLEES.

Filed May 24, 2022.   Nos. A-21-394 through A-21-396, A-21-449.

Appeals from the District Court for Custer County: MARK D. KOZISEK, Judge. Affirmed.

Terry K. Barber, of Barber & Barber, P.C., L.L.O., for appellants.

Brandon B. Hanson for appellees Trotter, Inc., and James A. Trotter, Trustee of the James A. Trotter Revocable Trust.

Matthew D. Furrow and Michael S. Borders for appellees CEK Investment Properties, L.L.C., and Lois-Jacquot Farm Company, L.L.C.

- 1 -

MOORE, RIEDMANN, and ARTERBURN, Judges.

RIEDMANN, Judge.

## INTRODUCTION

These four separate but related cases were consolidated for trial, resulting in a single order by the district court for Custer County. Alan J. Jacquot and Allison A. Jacquot (collectively, the Jacquots) appeal the court's order finding in favor of Trotter, Inc., and James A. Trotter, Trustee of the James A. Trotter Living Revocable Trust (collectively Trotter); CEK Investment Properties, LLC (CEK); and Lois-Jacquot Farm Co., LLC (Lois), and against the Jacquots in each case. On appeal, the Jacquots argue that the district court erred in declining to reform their written agreement with Trotter or set aside the trustee's sale of certain property and in awarding damages to CEK and Lois. We affirm.

## BACKGROUND

The facts giving rise to these cases are generally undisputed. The Jacquots were involved in farming activities for more than 30 years. Their business had been financed by a bank, which commenced collection activities in 2016, resulting in the Jacquots filing for Chapter 12 bankruptcy. Trotter has a history of financially assisting distressed farmers. Therefore, in 2016, an attorney for the Jacquots contacted an attorney for Trotter and inquired into whether Trotter would be interested in refinancing the Jacquots' obligations with the bank. Trotter eventually agreed to do so and took an assignment of the bank notes and security documents effective December 9, 2016. At that time, the Jacquots owed the bank $3,147,183.88.

The parties understood that Trotter was agreeing to provide short-term financing, referred to as a bridge loan, to allow the Jacquots time to secure financing with a conventional lender. Ultimately, in addition to paying off the debt to the bank, Trotter advanced a $1,850,000 line of credit to the Jacquots and an additional loan of $670,000. The parties signed several loan documents related to Trotter's financing, including a term promissory note, an agricultural loan agreement, and a trust deed. The term promissory note specified that it was due upon the earlier of January 15, 2018, or the parties' mutual agreement to renew, extend, or modify the note, and the other documents identified a due date of January 15, 2018.

Throughout 2017, the Jacquots attempted to secure financing with a bank but were unsuccessful. By January 15, 2018, the Jacquots had not repaid their debt to Trotter. Therefore, on March 12, 2018, after weeks of negotiations, the parties entered into a "memorandum workout agreement" (MWA). At that time, the Jacquots owed Trotter $4,423,843.70. According to Thomas Kruml, Trotter's attorney at the time and the party who drafted the documents at issue here, the MWA was done as an alternative to Trotter proceeding with a direct foreclosure when the debt remained unpaid after the due date.

The MWA provided that all indebtedness the Jacquots owed to Trotter became due and matured on January 15, 2018, with a default thereof arising and declared as of February 6, 2018. Under the MWA, the Jacquots transferred two parcels of land to Trotter, which reduced the amount of their debt, and Trotter agreed to suspend any debt enforcement, collection, foreclosure, or replevin activity for 60 days. The MWA specified, however, that all existing loan or lien instruments between the parties were to remain in full force and effect during the pendency of the

- 2 -

MWA and until Trotter was fully paid via the Jacquots completing a refinance of their indebtedness to Trotter. The MWA anticipated that a bank in Loup City, Nebraska, would loan the Jacquots money to pay off their debt to Trotter.

After the Jacquots reduced their debt by way of the MWA, the Loup City bank agreed to finance the Jacquots' operating costs for 2018. Although Trotter had not agreed to extend the due dates of its notes, it did not pursue any collection activities while the Jacquots were working with the bank in 2018. As a result of certain incidents that occurred in late 2018 and early 2019, the bank ultimately decided it was not willing to continue financing the Jacquots' operating costs or extending additional financing to pay off Trotter. Therefore, a meeting was set for February 2019 among the Jacquots, their attorney, James Trotter, and Kruml to discuss options moving forward. The meeting did not go well and lasted less than 5 minutes after Alan Jacquot's angry outburst. As a result, in early March 2019, Trotter sent notice to the Jacquots declaring them to be in default of their obligations and notifying them of Trotter's intention to begin foreclosure activities.

Thereafter, Trotter pursued its rights under the trust deed and gave notice of default and notice of trustee's sale. After a series of delays, a trustee's sale was ultimately held on April 3, 2020, and property was sold to CEK and to Lois to reduce the amount of the debt the Jacquots owed to Trotter. The Jacquots refused to vacate the properties sold at the trustee's sale, however, leading CEK and Lois to each commence an action for trespass and ejectment, seeking removal of the Jacquots from the properties, as well as damages.

Trotter also commenced an action against the Jacquots for replevin, seeking possession of certain personal property pledged as collateral for the loans in default. The Jacquots brought suit against Trotter, CEK, and Lois, alleging several causes of action. They asserted that the loan documents did not set forth the agreement made because of a mutual mistake, that they were not in default, that the loan documents should be reformed, that Trotter was not entitled to possession of the collateral, and that the trustee's sale should be set aside and title to the properties quieted in them. The four cases were consolidated for trial.

At trial, the parties adduced evidence as to their understanding of the agreement between Trotter and the Jacquots as it related to whether the written documents expressed the true intent of the parties. That evidence will be outlined in greater detail below.

The evidence also established that the properties sold at the trustee's sale were deeded to CEK and Lois on April 3, 2020. But when representatives of each purchaser attempted to access the properties, the Jacquots would not allow them to do so. CEK and Lois served notice to vacate or notice to quit on the Jacquots, but the Jacquots continued to refuse to vacate the properties. A representative from each purchaser testified that CEK and Lois each planned to rent out their property, and thus, each sustained a loss of rent as a result of not having use of the property.

James Eberle lives in Broken Bow, Nebraska, owns a farm operation, and sells real estate. He has been involved with a cow/calf operation all of his life and has sold agricultural real estate for 21 years. He also has his own rental properties. Based upon his personal knowledge and experience, he offered his opinions as to the amount of rent CEK and Lois could charge for their properties.

The property CEK purchased is 319.5 acres, including irrigated crop land, dry crop land, pasture land, the house in which the Jacquots live, and certain buildings and bins. For the house and buildings, Eberle believed a fair rental price would be between $1,200 and $1,500 per month.

He opined that a fair rental price for the irrigated crop land would be around $275 per acre on the low side, and for the dry crop land, $100 per acre or more. He was asked about the pasture land, and he explained that the rental price for that type of land "ranges all over" but that other owners either charge by the acre or by the season. He thought that a price of $43 to $45 per acre would be reasonable. As for charging "per season," Eberle explained that a season is 5 months long, and he believed that charging $2 per day, or a total of $300 for the 5-month season, per cow/calf pair was reasonable.

The land that Lois purchased is 9.9 acres with a house and buildings; it does not contain any useable farm land. In Eberle's opinion, a fair rental value for this property would be $900 to $1,000 per month.

After the conclusion of trial, the district court entered a written order. As it relates to the issues raised on appeal, the court found that there was no meeting of the minds or mutual understanding that Trotter would finance the Jacquots until they found other financing, and in effect, in perpetuity should they fail to find a new lender. Thus, the court had "little difficulty" concluding that the loan documents accurately reflected the intent of the parties. As a result, the court held that the Jacquots fell short of proving by clear, convincing, and satisfactory evidence that the parties agreed that they would only be required to pay Trotter if they found alternative financing. Based upon its decision not to reform the loan documents, the court also found the Jacquots had breached their obligation to pay the notes when due, and that that breach empowered the trustee to exercise the power of sale. Accordingly, the court determined that CEK and Lois were the lawful owners of the properties purchased at the trustee's sale and refused to set aside the sale or quiet title in the properties in the Jacquots.

The district court also awarded damages to CEK and Lois as a result of the Jacquots' refusal to vacate the properties. With respect to CEK's property, the court found reasonable rental prices to be $1,200 per month for the house and buildings, $275 per acre for the irrigated crop land, $100 per acre for the dry crop land, and $43 per acre for the pasture ground. The total amount of damages awarded to CEK was therefore $88,602. The court found that $900 per month was a reasonable rental value for Lois' property and awarded damages of $11,700. The court additionally ejected the Jacquots from the properties owned by CEK and Lois. The Jacquots appeal in each case, and the cases have been consolidated for disposition.

## ASSIGNMENTS OF ERROR

The Jacquots assign that the district court erred in (1) entering judgment in favor of each of the appellees, (2) determining that they had not proved their reformation claim, (3) determining that they had not proved their quiet title/set aside claim, and (4) awarding damages to CEK and Lois.

## STANDARD OF REVIEW

An action to reform a contract sounds in equity. *R & B Farms v. Cedar Valley Acres*, 281 Neb. 706, 798 N.W.2d 121 (2011). In an appeal of an equitable action, an appellate court tries factual questions de novo on the record, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial

judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of damages proved. *U.S. Pipeline v. Northern Natural Gas Co.*, 303 Neb. 444, 930 N.W.2d 460 (2019).

ANALYSIS

*Judgment in Favor of Appellees and Against the Jacquots'*
*Reformation and Quiet Title/Set Aside Claims.*

In their first three assignments of error, the Jacquots assert that the district court erred in entering judgment in favor of each of the appellees, finding that the Jacquots had not proved their reformation claim, and finding that they had not proved their quiet title/set aside claim. They argue these errors together in their brief, asserting:

> The underlying documents in this action, the loan documents, do not, and did not reflect the understanding of the parties at the time they were created and executed, and should be reformed to reflect the parties' true intentions, which were that Trotter would provide interim financing for the Jacquot farming and feeding operations until such time as they were in a position to attract conventional, commercial bank financing, at which time [Trotter] would be repaid in full. In doing so, the [district] court erred in its determination that [the Jacquots] had not established their reformation claim; and in its determination that the Jacquots had not established their quiet title/set aside claim.

Brief for appellant at 18.

Thus, the question before us is whether the district court erred in finding that the Jacquots failed to present clear and convincing evidence establishing that the due date of January 15, 2018, in all of the loan documents was a mutual mistake and did not reflect the intention of the parties. The Jacquots contend that the actual agreement of the parties was that Trotter would continue to finance them until they secured alternate financing. We find no error in the district court's decision.

An action to reform a contract sounds in equity. *R & B Farms v. Cedar Valley Acres, supra*. Reformation may be granted to correct an erroneous instrument to express the true intent of the parties to the instrument. *Id*. In an appeal of an equitable action, an appellate court tries factual questions de novo on the record, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *R & B Farms v. Cedar Valley Acres*, 281 Neb. 706, 798 N.W.2d 121 (2011).

The right to reformation depends on whether the instrument to be reformed reflects the intent of the parties. *Id*. Where it appears that a mistake has been made, a court will order the cancellation or the reformation of a deed. *Id*. To overcome the presumption that the agreement correctly expresses the parties' intent and therefore should be reformed, the party seeking reformation must offer clear, convincing, and satisfactory evidence. *Id*. Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *Id*.

A mutual mistake is a belief shared by the parties, which is not in accord with the facts. *Id*. It is a mistake common to both parties in reference to the instrument to be reformed, each party laboring under the same misconception about its instrument. *Id*. Mutual mistake exists where there has been a meeting of the minds of the parties and an agreement actually entered into, but the agreement in its written form does not express what was really intended by the parties. *Id*. If incorrect language or wording is inserted by mistake, including a scrivener's mistake, into an instrument intended to reflect the agreement of the parties, such mistake is mutual and contrary to the real intention and agreement of the parties. *Id*. The fact that one of the parties to a contract denies that a mistake was made does not prevent a finding of mutual mistake or prevent reformation. *Id*.

In the present case, the parties agree that the Trotter financing was intended to be a bridge loan, or short-term financing, until the Jacquots could secure financing through a bank. They also agree that all of the loan documents identify a due date of January 15, 2018. Thus, the question is whether that due date correctly memorializes the agreement of the parties, or whether, as the Jacquots assert, the parties' actual agreement was for Trotter to provide financing until they obtained alternate financing, regardless of how long that may have taken.

Alan and Allison Jacquot each testified at trial that the latter was their understanding. Allison explained that although the loan documents identify a January 2018 due date, she understood that Trotter was going to continue financing them past the stated due date until they were "bankable," however long that might have taken. Likewise, Alan testified that his understanding was not that the Trotter loans were due in full in January 2018, but, rather, that Trotter was going to renew the financing at that time and continue to finance them until they could find alternate financing with a conventional lender. They both additionally claimed that they trusted their attorney and that their understanding of the agreement was based on conversations they had with him.

Despite the Jacquots' testimony, the attorney who represented them throughout the financing process with Trotter testified to a different understanding of the parties' agreement. He, like all of the parties, understood that Trotter was willing to provide financing, but not on a permanent basis. According to him, the parties did not intend to guarantee the Jacquots' bankability, because that was probably not feasible, and the parties did not intend to allow the Jacquots to withhold payments to Trotter in perpetuity while they tried to become bankable. In the attorney's opinion, the loan documents accurately reflect the intentions of the parties.

James Trotter testified, repeatedly, that he intended to offer financing to the Jacquots for just one year, or in other words, through 2017 and until the January 2018 due date. For example, he was asked if he remembered talking with the Jacquots about the goal of making them bankable so they could obtain alternate financing, and he responded, "Well I imagine we was [sic] just in for a year. We call that a bridge loan; they get a bank to take care of 'em." He agreed that it was important that everyone understood that this was just a bridge loan, expounding that he wanted "to make sure it was just for a year." When questioned as to whether he understood that it was important for the Jacquots to find another lender, he confirmed, "I wanted out, just one year." James Trotter was asked when he got involved whether the intent was to give the Jacquots the chance to go to a bank, and he replied, "Give [them] a year's chance, and we call that a bridge loan; we get them going for a year." When asked, "But you weren't guaranteeing that [the

Jacquots] would catch on with a bank, though?" he replied, "No." James Trotter reiterated that Trotter was going to finance the Jacquots for one year and then have a bank buy Trotter out. Accordingly, they set a January 15, 2018, deadline in all of the documents.

Likewise, Kruml testified as to his recollection and intention of the parties' agreement and as the party who drafted the loan documents. He explained that the purpose of the agricultural loan agreement was to establish the nature of the agreement so that it was clear that it was a short-term or bridge deal. So part of the emphasis was to establish that the financing had a shorter term, and the documents provide that the financing was for the period ending January 15, 2018. He explained that all of the loan documents were geared toward a January 15 maturity date, and the purpose of the consistent maturity date was to be clear that this was not a long-term deal. Kruml reiterated,

> I don't want to keep stating the same thing redundantly, but it was really a bridge to try and give [the Jacquots] a chance to get to a bank. And that was the overriding goal. We tried to be clear that we weren't there to be a long-term lender; it was a bridge.

He was asked, "And to affirm your knowledge, there was no intention to continue to do operating notes [for the Jacquots] for a million dollars in perpetuity," and he responded, "No, no."

Kruml further explained that throughout 2017, he and James Trotter continued to encourage the Jacquots to look for a new financing source and not to wait to do so. According to Kruml, his involvement toward the end of 2017 and early 2018, was to communicate with the Jacquots' attorney to ensure that the Jacquots were aware of the upcoming January 2018 maturity date so they needed to have something in progress and in place by that time. He reiterated that Trotter did not want to be a "long-term stay-in-this-indefinitely type of a lender," and specified, "Again, it goes back to when we started in [20]16, early [20]17. It was a bridge and that's why all the notes were dated for January 15, 2018 maturities." Kruml was specifically asked whether at the time he and Trotter became involved, the end goal was to make the Jacquots bankable, and he responded that the goal was to *try* to get them bankable.

The foregoing evidence does not support the Jacquots' position that the actual intent of the parties was for Trotter to continue financing them until such time as they acquired a loan from a bank. As they admit, there was no way to know how long it might take them to secure conventional financing, and James Trotter and Kruml were clear that Trotter did not intend nor want to provide financing long-term or indefinitely. Although the Jacquots may have believed that Trotter intended to offer financing until they secured it through a bank, even their own attorney opined that the documents accurately reflect the parties' intent at the time they entered into the agreement.

In arguing to the contrary, the Jacquots rely heavily on the MWA, what it meant, and whether they performed their duties under it. By the time the MWA was executed, however, the debt was already past due, and the MWA made clear that all existing loan or lien instruments between the parties were to remain in full force and effect during its pendency and until Trotter was fully paid. The purpose of the MWA was to temporarily suspend collection or foreclosure activities, not to forgo the debt that the Jacquots owed to Trotter. Moreover, the issue is the intent of the parties at the time the loan documents were signed, which was more than a year prior to the MWA. Based on the foregoing evidence, we find that the district court did not err in declining to reform the written agreement based upon a mutual mistake.

With respect to the quiet title/set aside claims, the Jacquots sought to set aside the trustee's sales to CEK and Lois based upon their position that they had not breached the loan agreements and were not in default, and that therefore the trustee did not have the authority to sell the real estate granted by the trust deed. Having found that the Jacquots' debt was due by January 15, 2018, and that they failed to satisfy their obligation, as the district court found, their breach of the agreements empowered the trustee to exercise the power of sale. Accordingly, the court properly rejected the Jacquots' claim to set aside the trustee's sales and quiet title.

*Damages.*

The Jacquots also allege error in the court's award of damages to CEK and Lois. They claim that the amount of damages was speculative and unsupported by the evidence and also that the court erred in failing to consider marketing time. We disagree.

While damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural. *TNT Cattle Co. v. Fife*, 304 Neb. 890, 937 N.W.2d 811 (2020). Uncertainty as to the fact of whether damages were sustained at all is fatal to recovery, but uncertainty to amount is not if the evidence furnishes a reasonably certain factual basis for computation of the probable loss. *Id*. The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Id*. A plaintiff may seek rents and profits in an ejectment action. *Wicker v. Waldemath*, 238 Neb. 515, 471 N.W.2d 731 (1991).

The Jacquots recognize that the district court's damages awards were supported by Eberle's testimony. They claim that with respect to the damages awarded to CEK, however, the district court disregarded a portion of Eberle's testimony and substituted its own opinion. As it relates to the Jacquots' argument, Eberle explained that for the pasture land that is part of the property CEK purchased, the rental price "ranges all over," but other owners either charge by the acre or by the season. He opined that $43 to $45 per acre was a reasonable charge. As for charging "per season," he explained that a season is 5 months long or 150 days, and he believed that charging $2 per day, or a total of $300, per cow/calf pair was reasonable.

The district court found that Eberle's estimated cost per season was unreasonable. Instead, it found that the appropriate rental value of the pasture ground was $43 per acre. The Jacquots are correct that the court disregarded Eberle's testimony as to one method of calculating rental price for CEK's pasture land, but rather than substituting its own opinion as the Jacquots claim, the court used the alternative method that Eberle offered. The court's use of $43 per acre was supported by Eberle's testimony and was the low end of the range to which he testified would be reasonable. Accordingly, the amount awarded to CEK and Lois was properly supported by the evidence and not speculative.

The Jacquots also argue that the damages the district court awarded were erroneous because the court failed to consider and determine the extent of marketing time necessary to put the land to rent and to consider and determine whether and when a tenant would be willing and available. They cite to no authority requiring a court to make such a consideration when awarding damages for rents and profits, and we, likewise, have found none.

Eberle was asked at trial for his opinion on marketing time for the various parts of land. For example, when asked how long he believed it would take to market the buildings located on the land Lois purchased, he initially responded "not a long time." When pressed further, he answered that it would depend on how they were priced. When asked to assume that the price was "at least in the ballpark," he estimated that it would take perhaps 90 to 180 days. With respect to the irrigated crop land, dry crop land, and pasture ground on the parcel that CEK purchased, assuming, again, that it was "priced right," he opined that "it could be gone tomorrow" because of the current market for that type of land. Based on the uncertainty of Eberle's testimony relating to marketing time and the assumptions he was asked to make before rendering his opinions, we find that the district court did not err in failing to include a reduction in the damages amount for marketing time. We therefore affirm the amount of damages awarded to CEK and Lois.

## CONCLUSION

We find no error in the district court's decision declining to reform the loan documents or set aside the trustee's sale and quiet title to the properties sold to CEK and Lois. We also find no error in the award of damages to CEK and Lois. The court's order is therefore affirmed.

AFFIRMED.