IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

JAMA V. SEU

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MOHAMUD ALI JAMA ET AL., APPELLANTS,

V.

JUNG SEU, APPELLEE.

Filed May 28, 2024.    No. A-23-497.

Appeal from the District Court for Douglas County: W. RUSSELL BOWIE III, Judge. Affirmed.

Brent W. Nicholls, of KN Law, P.C., L.L.O., for appellants.

John C. Chatelain, of Chatelain & Maynard, and Jacob A. Acers, of The Saathoff Law Group, P.C., L.L.O., for appellee.

PIRTLE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

## INTRODUCTION

In March 2010, Mohamud Ali Jama and Abdiaziz Mohamed (collectively, "the Tenants") entered into a lease agreement and option to purchase certain commercial property with Jung Seu. A dispute arose over whether the Tenants exercised their purchase option. Seu determined the property was abandoned in August 2016, and subsequently terminated the lease agreement and took possession of the property. In November 2020, the Tenants and their subtenant filed an action against Seu in the Douglas County District Court seeking various relief. Seu filed a counterclaim seeking to quiet title and for damages for past due rent and an outstanding loan debt. Following a bench trial, the district court denied the parties' respective claims for relief. We affirm.

BACKGROUND

The Tenants met Seu through a mutual acquaintance who knew that Seu had a commercial property available for rent. On March 31, 2010, they entered into a "Business Property Lease" (Lease) and option to purchase addendum for a commercial property on South 20th Street in Omaha, Nebraska. The term of the Lease commenced April 1, 2010, and ended March 31, 2020. The Lease provided that the "total Base Rent" was $397,800, to be paid over a period of 10 years. Monthly rent was set at $3,000 per month from April 1, 2010, through March 31, 2013; $3,250 per month from April 1, 2013, through March 31, 2016; and $3,600 per month from April 1, 2016, through March 31, 2020. As relevant here, the Tenants would be in default or breach if they "fail[ed] to pay [Seu] any rent or other payments when due" or if they "vacate[d] or abandon[ed] the Premises." In the event of such breach or default, Seu could "re-enter the Premises immediately and remove the property and personnel of [the] Tenant[s]," "retake the Premises," and "terminate th[e] Lease by giving written notice of termination to [the] Tenant[s]."

Attached to the Lease was an "Addendum to Business Property Lease with Option to Purchase" (First Addendum), which gave the Tenants an option to purchase the property for $300,000 within the first 3 years of the lease. They were to receive a $72,000 credit towards the purchase price if they "made improvements to the property" during the term of the Lease. The First Addendum further provided that the Tenants understood the property was being leased "as is." Over the following 2 years, Seu and the Tenants entered into three additional addenda, with each addendum indicating it "shall become part of and to the extent inconsistent with replace and modify the . . . Lease . . . dated March 31st, 2010, including all prior addendums." The relevant provisions of each addendum follow.

On February 10, 2011, Seu and the Tenants entered into a "Second Addendum to Business Property Lease with Option to Purchase" (Second Addendum), which referred to itself as a "Contract for Deed" or "Purchase Agreement." The Second Addendum provided that if the Tenants "first make the payments and perform the covenants" set out in the Second Addendum, Seu would "covenant[] and agree to convey" the property to the Tenants. Under a provision titled, "CONTINUATION OF RENT AND PAYMENT OF PURCHASE PRICE," the parties agreed that the purchase price would be $228,000 and Seu acknowledged his receipt of $114,000 towards the purchase price. The Second Addendum further provided,

> In addition to paying a monthly rental fee of $1,500 due on the 10th day of each month Tenants agree to pay over to the Landlord on or before April 1, 2016 the full amount of the remaining Purchase Price. The base $1,500 a month rental payment shall in no way affect the balance due on the Purchase Price. However any sum paid by the Tenants to the Landlord after this date, other than . . . for . . . property tax or insurance payments . . . shall be credited against the remaining Purchase Price balance. The Tenants may pre pay the balance at any time, and when the remaining Purchase Price balance has been fully paid the Landlord shall tender the Warranty Deed and perform such acts as described below.

The Second Addendum further stated that "[t]his Contract for Deed is the entire agreement between the parties with respect to the transaction contemplated herein[.] It replaces and

supersedes any and all oral agreements between the parties, as well as any prior writings." It also required that any notice "must be in writing."

On July 21, 2012, Seu and the Tenants entered into a "Third Addendum to Business Property Lease with Option to Purchase" (Third Addendum), that "shall become part of and to the extent inconsistent with replace and modify the . . . Lease with Option to Purchase dated March 31st, 2010, including all prior addendums, as restated in the Second Addendum . . . which was made effective on or about February 10, 2011." The Third Addendum "restated" the purchase price as a "balance of $164,000" "to be paid in full on or before April 1, 2020." It further stated,

> In all other respects, the repayment and all other terms as described in the Second Addendum, subject to an increase in the monthly rent as set out herein shall remain the same. The new base monthly rental payments shall in no way affect the balance due on the Purchase Price and shall escalate on the following dates so as to be due on the 10th of each month in the following amounts:
>
> 1. As of the Effective Date and through March 2013 the base rent shall be $2,250 a month.
>
> 2. As of April 10, 2013 and through March 2016 the base rent shall be $2,450 a month.
>
> 3. As of April 10, 2016 and through the conclusion of the term ending April 1, 2020 [t]he base rent shall be $2,750.
>
> Any sum paid by or on behalf of the Tenants to the Landlord after the Effective Date, other than . . . property tax or insurance payments . . . shall be credited against the remaining Purchase Price balance.

The parties testified at trial that the purchase price under the Third Addendum reflected a $50,000 loan from Seu to the Tenants for the purpose of improving the property. (We note here that the $164,000 balance under this Third Addendum equals the $114,000 balance under the Second Addendum plus the $50,000 loan, thus indicating that no monthly rent payments from February 10, 2011, through July 21, 2012, had been applied to the purchase price balance.) The Third Addendum reflected that it was the "entire agreement between the parties" and that it "replaces and supersedes any and all oral agreements between the parties, as well any prior writings, other than the Second Addendum . . . which is affirmed and incorporated by reference herein." Once again, any notice was to be given in writing.

The "Fourth Addendum to Business Property Lease with Option to Purchase" (Fourth Addendum), executed on December 13, 2012, stated that "if the Tenants shall first make the payments and perform the covenants hereinafter mentioned the Landlord [Seu] hereby covenants and agree[s] to convey to the Tenants . . . in fee simple absolute . . . a good and sufficient warranty deed." It also referred to Seu's approval of the Tenants' construction and remodeling plans and indicated that Seu "shall advance to the tenants the sum of $75,000 to be used in the furtherance of . . . the Tenants' business." The addendum also provided:

> By this Addendum the Purchase Price for the Property shall be increased by $75,000 and as of the Effective Date a balance of $239,000, after the increase herein contemplated, shall exist as the remaining Purchase Price to be paid in full on or before April 1, 2016. In all other respects, the repayment and all other terms as described . . .

through the Third Addendum shall remain operative and in effect as written. Minimum rent shall however now be set at $3,750 a month consisting of base rent of $2,250 plus an additional Increased Rental Payment of $1,500 (the 'Increased Rental Payment') on account of the purchase price increase set out in this Fourth Addendum.

Except as detailed herein, the amount of the base and minimum rental payments shall in no way affect the balance due on the Purchase Price. However any sum paid by the Tenants to the Landlord after the Effective Date of this Fourth Addendum, other than . . . for property tax or insurance payments . . . shall be credited against the remaining Purchase Price balance. Of the $3,750 monthly rental payments which shall come due after the Effective Date $1,500 shall be designated as reducing the balance of the $75,000 purchase price increase herein advanced. The Tenants may also designate additional sums as going first towards repayment of the additional $75,000.

The parties testified at trial that the purchase price under the Fourth Addendum reflected an additional $75,000 loan from Seu to the Tenants for the purpose of improving the property. (We observe again here that the previously adjusted purchase price of $164,000 plus the new $75,000 loan equals the increased purchase price of $239,000. Further, this addendum specifically allowed a credit towards the purchase price of only $1,500 of the increased monthly payment intended to repay the $75,000 loan.) The Fourth Addendum also stated that it was the "entire agreement between the parties" and "[i]t replaces and supersedes any and all oral agreements between the parties, as well as any prior writings, other than the Second and Third Addendum . . . which is affirmed and incorporated by reference herein." The final addendum also reiterated that "[a]ny notice to be given . . . in connection with this Agreement, must be in writing."

TRIAL

A bench trial took place in April 2023. The Lease and subsequent addenda were received into evidence. Mohamed testified that the condition of the building when he and Jama initially began renting the property was "so bad." He described the windows being boarded up and broken, the roof leaking, and weeds growing inside the building. There was also no heating, cooling, electricity, or water in the building. The Tenants testified that they expended significant funds on building repairs, including restoration of the HVAC systems, roof repairs, and interior repairs to damage caused by moisture, as well as flooring and window replacement. Mohamed stated that he put in "almost [$]400,000" to renovate the building and would not have done so had he realized they were merely renting the property rather than purchasing it. The district court received into evidence various invoices and cancelled checks which the Tenants testified were related to building repair expenses; however, the amounts set out in the checks and invoices totaled a sum significantly less than $400,000.

Mohamed testified that, throughout the term of the Lease, Seu would pick up rent payments in cash at irregular intervals "whenever he fe[lt] like coming," and he and Jama would pay the rent that had accrued from the date of Seu's last visit. According to the Tenants, they attempted to exercise the purchase option during a meeting at Jama's grocery store on March 5, 2016. The Tenants believed they owed approximately $190,000 of the purchase price at the time. According to them, they offered to pay Seu that amount, but he declined. They then offered to pay Seu

$250,000, but he declined again. They claimed that Seu demanded that they pay him $500,000 for the property because its value had increased since the commencement of the lease. Seu denied that this meeting ever took place, or that he received notice regarding the meeting.

Seu stated that he believed that, to exercise the purchase option, the Tenants had to pay him the full purchase price under the Fourth Addendum ($239,000) in addition to any outstanding rent, which he stated was $18,159 at the time of the alleged March 5, 2016, meeting. He stated that if the Tenants had believed his calculation of their past due rent was incorrect, he would have reviewed that calculation for them. However, according to Seu, the Tenants never disputed his calculation. Mohamed acknowledged he and Jama previously stated in an interrogatory response that they were in arrears on rent in the amount of $18,159 on March 5.

Seu testified that after the alleged meeting, the parties continued paying rent until August 2016, when Seu noticed the Tenants had abandoned the property. Seu then provided the Tenants with a notice of termination of the Lease, which the district court received into evidence. The notice was dated May 23, 2017, and showed it was sent to the Tenants by certified mail. Seu subsequently took possession of the property and instructed Jama to remove the personal property that remained in the building. According to Seu, in June 2017, Jama sent two men to pick up certain personal property. Mohamed claimed they were suddenly locked out of the building and were not able to retrieve various items of personal property, such as computers and furniture. Seu said that for a period of time, he waited for the Tenants to return to him to purchase the property. When they did not, he decided to rehabilitate the property, since it had been vandalized when it was abandoned. Seu stated that he spent "between 30 to $40,000" to restore the property so he could rent it to new tenants.

## DISTRICT COURT'S ORDER

After the parties submitted written closing arguments, the district court entered an order on May 31, 2023, entering judgment in favor of Seu on the Tenants' (and subtenant's) amended complaint, and in favor of the Tenants (and subtenant) on Seu's counterclaim. The court noted that it previously determined in an order entered on April 7 that the Lease and the First Addendum were unambiguous, but that the Second, Third, and Fourth Addenda were ambiguous as to whether the rent payments impacted the purchase price necessary to exercise the purchase option. It determined that since the Tenants' attorney had prepared those documents, it would construe the conflicting terms in favor of Seu. Therefore, it found that "the rent paid did not reduce the purchase price," and the agreement was "a Lease with Option to Purchase, and not a Contract for Deed."

The district court further determined that "[n]one of the relevant documents contain[ed] a mechanism by which the [Tenants] were to exercise their option to purchase – only that the amount due on April 1, 2016[,] would need to be tendered to [Seu], which would trigger [his] responsibility to deliver fee title to the [Tenants]." The court found that regardless of whether the alleged March 5, 2016, meeting took place, it was "unequivocal that [the Tenants] did not exercise their option by tendering the agreed upon purchase price of $239,000 on April 1, 2016." Thus, Seu was not required to convey the property to the Tenants. The court further noted that Seu testified that the Tenants abandoned the property, and Seu later terminated the Lease and took possession of the property pursuant to the terms of the Lease. The court "reject[ed] the remaining theories of relief presented by the [Tenants] for a failure of proof at trial."

As to Seu's counterclaim, the district court determined that the $125,000 in loans Seu gave the Tenants were actually "adjustments to the purchase price" and that "those sums d[id] not create an independent loan obligation against the [Tenants]." The court further found that while there was testimony that the Tenants were in arrears in rent on March 5, 2016, there was no testimony that they were in arrears at the time of the filing of Seu's counterclaim or at the time of trial. Therefore, the court denied Seu's counterclaim as well.

## ASSIGNMENTS OF ERROR

The Tenants assign that the district court erred in (1) finding there was no mechanism to exercise the purchase option, (2) failing to make a determination as to whether Seu "repudiate[d] the contract," and (3) "allowing the prevented exercise of the option to act as a penalty forfeiture of $187,500, which the [Tenants] had paid toward the Option Exercise price."

## STANDARD OF REVIEW

The interpretation of a contract and whether the contract is ambiguous are questions of law. *Avis Rent A Car Sys. v. McDavid*, 313 Neb. 479, 984 N.W.2d 632 (2023). An appellate court independently reviews questions of law decided by a lower court. *Id.*

## ANALYSIS

As a preliminary matter, we address Seu's point that "considerable time" had to be spent searching through the bill of exceptions to determine the source of the Tenants' asserted facts since their brief did not consistently comply with appellate court rules. Brief for appellee at 11. Neb. Ct. R. App. P. § 2-109(D)(1)(g) states:

> The statement of facts shall be made in narrative form, and shall consist of so much of the substance of the record as is necessary to present the case. Each and every recitation of fact, whether in the statement of facts or elsewhere in the brief, shall be annotated to the record in the manner set forth in § 2-109(C)[.]

The failure to do so may result in an appellate court's overlooking a fact or otherwise treating the matter under review as if the represented fact does not exist. *Sturzenegger v. Father Flanagan's Boys' Home*, 276 Neb. 327, 754 N.W.2d 406 (2008). Because this court's review of the errors raised on appeal requires more attention to the Lease and addenda at issue than the testimony, we need not resort to such measures in this instance. However, we do caution against such noncompliance in the future.

### MECHANISM TO EXERCISE PURCHASE OPTION

The Tenants' first assigned error is related to the district court's "finding regarding the lack of a mechanism to [e]xercise the [o]ption." Brief for appellant at 11. They argue that the mechanism to exercise the option to purchase was set out in the Second Addendum, which "specified that [Seu] was obligated to furnish a title commitment and set[ ]up an escrow account at least 5 days prior to the date the [Tenants] indicated they would be making their final payment against the $114,000 purchase price." *Id.* at 34. However, under the same provision, Seu's obligation to "furnish an Owners Title Insurance Commitment" within 5 days of final payment would only have been triggered if the Tenants notified him of their intent to make such payment

- 6 -

"at least 20 days prior to the proposed date of the final payment." The Second Addendum also provided that notice had to be given in writing. There was no evidence that the Tenants provided such notice.

Further, the district court did not find that there was no mechanism for the Tenants to exercise their purchase option. Rather, it correctly found that the only mechanism was the payment of the purchase price by the April 1, 2016, deadline. In interpreting contracts, the court as a matter of law must first determine whether the contract is ambiguous. *Wintroub v. Nationstar Mortgage*, 303 Neb. 15, 927 N.W.2d 19 (2019). An instrument is ambiguous if a word, phrase, or provision in the instrument has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Id.* If a contract is unambiguous, the intent of the parties must be determined from the contents of the contract. *Id.* The interpretation of a contract and whether the contract is ambiguous are questions of law subject to independent review. *Id.*

Here, the district court determined there was ambiguity as to the purchase price due under the Second, Third, and Fourth Addenda because they contained terms which were susceptible to two reasonable but conflicting interpretations. The court applied the rule of contract interpretation that ambiguous contracts are construed against the drafter. See *Beveridge v. Savage*, 285 Neb. 991, 830 N.W.2d 482 (2013). The court determined that, since the Second, Third, and Fourth Addenda were prepared by the Tenants' attorney, it would construe the documents in favor of Seu and adopt the interpretation that the monthly payments were merely rent and the purchase price was a separate amount which the Tenants would have to pay to exercise their purchase option. We agree that the documents created ambiguity and, like the district court, construe the conflicting terms to create an agreement for monthly lease payments along with an option to purchase based upon the adjusted lump sum in each subsequently executed addendum. The Fourth Addendum states that the "base and minimum rental payments shall in no way affect the balance due on the Purchase Price." However, it also provides that "any sum paid by the Tenants to [Seu] after the Effective Date . . . shall be credited against the remaining Purchase Price balance." The Second and Third Addenda contained similar conflicting provisions regarding whether rental payments would impact the purchase price. Those terms of the addenda were directly conflicting on the issue of whether the monthly rental payments impacted the purchase price, and they were thus ambiguous.

We agree with the district court that the Fourth Addendum required "the remaining Purchase Price" to "be paid in full on or before April 1, 2016." However, we read the Fourth Addendum to allow $1,500 of the monthly rent to be applied to the reduction of the $75,000 loan, which would have reduced the $239,000 purchase price. But even if the purchase price of $239,000 should have been reduced by some amount, that reduction is irrelevant to the outcome since no purchase price payment was made by April 1, 2016. Each addendum refers to the monthly payments owed to Seu as rent payments and provides that "if the Tenants shall first make the payments and perform the covenants" set out in the addendum, Seu shall "covenant[] and agree to convey to the Tenants" the property. In each addendum, the Tenants had the "first" obligation to "make the payments," not to negotiate them, in order to trigger the option to purchase. Therefore, even if the alleged March 5 meeting had taken place as described by the Tenants, the Tenants' offers would have been insufficient to trigger Seu's obligation to convey the property. In order to exercise the option to purchase, the Tenants had to first make all payments, which included rent ($18,159 in arrears on March 5, 2016) and the purchase price ($239,000, as reduced). As such, for

the Tenants to exercise their option and trigger Seu's obligation to convey the property, they would have had to tender those amounts. The Tenants testified that at the alleged March 5 meeting, they offered to pay Seu $190,000, and when Seu declined to accept that offer, they offered to pay Seu $250,000. But regardless of any negotiations that may have taken place on March 5, the fact remained that the Tenants did not "first" make the payments owed by April 1 in order to exercise their option to purchase. Had they simply tendered a check for $250,000, the outcome of this case may have been different.

We find no error in the district court's findings regarding the mechanism to exercise the purchase option.

## REPUDIATION

The Tenants contend that the impact of the first assigned error was "compounded" when the district court relied on its finding that there was no mechanism to exercise the purchase option and failed to make a determination as to whether Seu "did in fact repudiate the contract." Brief for appellant at 11. The Tenants argue that they "performed all of [their] obligations under the Purchase Agreement," and were "ready, willing, and able to pay [Seu] the purchase price due upon [Seu]'s delivery . . . of a good and sufficient warranty deed." *Id.* at 27. They specifically refer to the offers they made during the alleged March 5, 2016, meeting and contend that their "effort to [e]xercise their [p]urchase right was thwarted by . . . Seu's repudiation of the agreement where . . . Seu demanded $500,000 before he would release the property." *Id.* at 7. However, other than generally asserting that Seu repudiated the parties' agreement by demanding $500,000, the Tenants do not cite to specific evidence, nor otherwise develop an argument as to this claim. Regardless, because the evidence does not support that the Tenants properly exercised their purchase option, as discussed above, any alleged response from Seu is irrelevant.

## PENALTY FORFEITURE

The Tenants assign that the district court erred when it "allow[ed] the prevented exercise of the option to act as a penalty forfeiture of $187,500, which the [Tenants] had paid toward the Option Exercise price." Brief for appellant at 11. They claim the forfeited amount includes the $72,000 credit against the purchase price for improvements made to the property, the $114,000 payment against the purchase price acknowledged in the Second Addendum, and a $1,500 security deposit. They state that the court found there was a failure of proof on their "claim of unjust enrichment/forfeiture related to Seu's retention of the $187,500 in prepayments and credit against the option exercise price." *Id.* at 10.

We note that while the issue of unjust enrichment was raised in the Tenants' Amended Complaint and their written closing argument, it was raised only in relation to the alleged improvements they made on the property--not the "prepayments" toward the purchase price. To the extent the present argument relates to their unjust enrichment claim, we decline to address it since it was not raised at the trial level. See *Elbert v. Young*, 312 Neb. 58, 977 N.W.2d 892 (2022) (issue raised for first time in appellate court will be disregarded inasmuch as lower court cannot commit error in resolving issue never presented and submitted to it for disposition).

The issue of "prepayments" was, however, raised in the amended complaint under a "claim of equitable conversion." To the extent this assigned error is related to that claim, we find that the

district court correctly rejected it. The doctrine of equitable conversion applies in certain cases where parties enter into a contract for the sale of land. See *McGinley v. Forrest*, 107 Neb. 309, 186 N.W. 74 (1921) (when valid and enforceable contract for sale of land has been made, equity will regard vendor as holding title for benefit of purchaser, and purchaser as holding unpaid purchase money for benefit of vendor, and therefore, the purchaser must be regarded in equity as real owner). However, as we previously discussed, there was no contract for the purchase of land in this case since the Tenants failed to properly exercise their option. We therefore find no error as to the court's rejection of the Tenants' claim as it related to the "prepayments" toward the purchase price.

REMAINING ARGUMENTS

The Tenants make numerous additional arguments throughout their brief on appeal which are not assigned as error, including arguments related to Seu's allegedly fraudulent accounting of the Tenants' rent. We decline to address those arguments since they were not specifically assigned as error. See *TNT Cattle Co. v. Fife*, 304 Neb. 890, 937 N.W.2d 811 (2020) (alleged error must be both specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court).

CONCLUSION

For the reasons set forth above, we affirm the district court's May 31, 2023, order.

AFFIRMED.