IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

NERUD V. SCHULER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

LORI NERUD, APPELLANT AND CROSS-APPELLEE,

V.

DARRELL D. SCHULER II, APPELLEE AND CROSS-APPELLANT.

Filed February 10, 2026.    No. A-25-325.

Appeal from the District Court for Morrill County: ANDREA D. MILLER, Judge. Affirmed.

Charles E. Wilbrand and Robert J. Drust III, of Knudsen, Berkheimer, Richardson & Endacott, LLP, for appellant.

Robert M. Brenner and Paul A. Payne, of Robert M. Brenner Law Office, for appellee.

MOORE, BISHOP, and WELCH, Judges.

WELCH, Judge.

### INTRODUCTION

Lori Nerud appeals, and Darrell Schuler II (hereinafter referred to as "Butch") cross-appeals, from the Morrill County District Court's order finding that no contract existed between Lori and Butch for the sale of Lori's 597.3 shares of stock in Schuler-Olsen Ranches, Inc. (SOR). Generally, both parties argue that the district court erred in finding that no contract existed for the sale of Lori's shares in SOR and in failing to determine the valuation of Lori's shares in SOR. For the reasons stated herein, we affirm.

### STATEMENT OF FACTS

Lori and Butch are siblings and are shareholders of SOR, which is a closely held family corporation established in 1962 by Lori and Butch's parents, Mary Louise Schuler and Darrell Schuler. In 1983, Mary Louise and Darrell, who were the sole shareholders of SOR at that time,

- 1 -

executed a Shareholders' Agreement. In January 1998, the current shareholders, which included Lori and Butch, executed a First Amendment to the Shareholders' Agreement. The amendment restricted the shareholders' rights to transfer shares of SOR to anyone except Mary Louise, Darrell, their children or descendants, and any person married to them, but otherwise ratified the provisions in the Shareholders' Agreement. Mary Louise and Darrell, as contemplated by the Shareholders' Agreement, both subsequently executed individual wills and trust agreements that provided for the distribution of their individual shares in SOR.

After Mary Louise passed away in 2005, the personal representative of Mary Louise's estate provided notice to SOR of the intent to transfer Mary Louise's shares in SOR from her estate into Mary Louise's Trust as provided in Mary Louise's will and subsequently completed that transfer. Darrell passed away in April 2017. Although Darrell's shares of SOR were supposed to be distributed to Darrell's Trust, the parties, as beneficiaries, agreed to a direct distribution of assets, including shares in SOR from Darrell's estate, to Lori and Butch.

In August 2017, Lori first communicated to SOR and Butch her desire to sell her shares in SOR for fair market value (FMV). Over the next several years, Lori and Butch attempted to negotiate a price for those shares but could not reach an agreement on a sale price. In June 2018, the trustee of Mary Louise's Trust transferred the shares of stock in SOR held in the Trust to Lori and Butch. In September 2018, the personal representative of Darrell's estate transferred shares of SOR held in Darrell's estate to Lori and Butch. Following those distributions, Butch owned 1,197.7 shares of SOR; Lori owned 597.3 shares; Butch's wife owned 28 shares; Butch's children owned 152 shares; and Lori's daughter owned 48 shares.

In September 2021, Lori filed a complaint for declaratory judgment against Butch, requesting that the Morrill County District Court determine no contract existed for the sale of Lori's shares of SOR to Butch and declare that Lori still owned her shares in SOR; but, in the alternative, if the district court determined that a contract had been formed, that the purchase price of Lori's shares should be based on their FMV.

In his answer and counterclaim, Butch admitted that Lori indicated her desire to sell, and he indicated his desire to purchase, Lori's shares of SOR. However, he denied that he agreed to purchase the shares at FMV and instead insisted on following the terms of the Shareholders' Agreement, which required the shares be sold for "book value." In his counterclaim against Lori, Butch alleged claims of breach of contract, unjust enrichment, quantum meruit, and false representations.

Trial was held over 3 days in August 2024. Prior to trial, the parties stipulated to the appropriate valuation date for SOR, June 30, 2020, and to the admission of certain exhibits, and indicated that the issues to be decided were whether a contract had been formed for the sale of Lori's shares to Butch, and if so, whether the purchase price was for FMV or for book value. Testimony was adduced from Lori; Butch; Thomas Luhrs, a real estate appraiser; Ty Cox, a CPA; Matthew Stadler, a CPA; and Del Ray Kraupie, another appraiser.

Lori's and Butch's trial testimony did not appear to dispute the following facts:
- that they had never entered into a separate written contract governing the sale of Lori's shares;
- that both Lori and Butch signed the Amended Shareholders' Agreement in 1998;
- that following Mary Louise's death, her shares were held in trust;

• that Mary Louise's Trust contained provisions for the distribution, sale, and transfer of any shares at FMV;

• that following the distribution of the shares of SOR held in Mary Louise's Trust and the shares of SOR held in Darrell's estate, Lori owned 597.30 shares in SOR;

• that Lori provided notice pursuant to the Trust Agreements of her desire to sell her shares in SOR at FMV;

• that, following Darrell's death in April 2017, Lori and Butch began negotiations for the sale of Lori's shares following her notice issued on August 25, 2017;

• that as of January 2021, the parties had not reached an agreement on the purchase price for Lori's shares of SOR;

• that during their negotiations, neither Lori or Butch mentioned net book value or the Shareholders' Agreement for determining the value of SOR shares or the price per share;

• that Butch made a $250,000 "partial payment for shares" to Lori and provided Lori with pivots valued at $41,000 in 2020;

• that no valuations of SOR were completed after 1993 as contemplated by the Shareholders' Agreement;

• that in April 2021, Butch, without agreement by Lori, sent Lori a promissory note and payments pursuant to the Shareholders' Agreement for the remaining purchase price of Lori's shares as calculated by Butch which Lori refused and returned to Butch; and

• Lori and Butch did not have any additional conversations or engage in further negotiations between their January 2021 meeting and April 2021, when Butch sent Lori the promissory note.

But the parties disagreed on the legal impact of their dealings. Summarized, Lori argued that these facts required a finding that the terms of Mary Louise's Trust controlled the outcome, and that Butch was contractually obligated to purchase her shares at FMV as presented at trial. Conversely, Butch argued that these facts required a finding that the terms of the Shareholders' Agreement controlled the outcome, and that Lori was contractually obligated to sell her shares to him at book value as that value was presented at trial.

In March 2025, the district court found that no contract existed between the parties and that Lori retained her 597.3 shares of SOR, and ordered Lori to pay Butch $291,000, which placed the parties "in their original position prior to the litigation." In finding that there was no contract between the parties, the court noted that Lori sent Butch a notice of her intent to sell her shares as required under the trust documents, but no further action regarding the sale occurred; that although the parties attempted to negotiate terms for the sale of Lori's shares, there were long lapses between negotiations and no written agreement was reached; that during a January 2021 meeting, Lori declined Butch's offer that excluded the value of cattle and other inventory; that the purchase price was a material term in light of the fact that Lori was not required to sell her shares and Butch was not required to purchase Lori's shares; that despite Butch's claim that a contract was created as a result of the Shareholders' Agreement, Butch failed to follow the express provisions of the Shareholders' Agreement regarding the sale or transfer of shares; and that none of the pleadings requested that the court find that the Shareholders' Agreement applied to any sale of stock by Lori.

Lori has appealed the district court's findings and Butch has cross-appealed.

## ASSIGNMENTS OF ERROR

Although Lori and Butch independently identified assignments of error, because some issues overlap, we consolidate and restate the issues presented on appeal as follows: That the district court erred in: (1) finding that no written contract existed for the sale of Lori's shares to Butch; (2) finding that no oral contract existed for the sale of Lori's shares to Butch; and (3) failing to consider valuation evidence, failing to determine the value of Lori's shares of SOR, and failing to allow Lori to amend her complaint to conform with valuation evidence presented at trial. Lori also contends that the district court erred in (4) entering judgment against her for $291,000 on summary judgment prior to determining whether a contract existed between the parties.

## STANDARD OF REVIEW

An action for declaratory judgment is sui generis; whether such action is to be treated as one at law or one in equity is to be determined by the nature of the dispute. *TNT Cattle Co. v. Fife*, 304 Neb. 890, 937 N.W.2d 811 (2020). When a dispute sounds in contract, the action is to be treated as one at law. *Weyh v. Gottsch*, 303 Neb. 280, 929 N.W.2d 40 (2019).

In appellate review of an action for a declaratory judgment in a law action, factual findings by the trier of fact will not be set aside unless such findings are clearly erroneous. *TNT Cattle Co. v. Fife, supra*.

The interpretation of a contract and whether the contract is ambiguous are questions of law subject to independent review. *Seemann v. Seemann*, 318 Neb. 643, 18 N.W.3d 118 (2025).

## ANALYSIS

### WRITTEN CONTRACT

Both parties first assert that a written contract exists between them and that the district court erred in failing to enforce the applicable written contract in their favor. Lori asserts that Mary Louise's and Darrell's Trusts provided the terms of an enforceable agreement between her and Butch, while Butch argues that the terms of the contract were set forth in the Shareholders' Agreement. We will address these arguments first, as the outcome of this issue resolves most of the errors assigned by the parties.

The original shareholders entered into a Shareholders' Agreement in 1983, which provided numerous transfer restrictions governing all shares of stock in SOR. In 1998, the then-current shareholders, including Butch and Lori, amended the 1983 Shareholders' Agreement in which, among other things, the shareholders agreed to be bound by its terms and conditions set forth in § 2.6 of the Agreement. As it relates to the issues in this case, the applicable provisions in the original 1983 Shareholders' Agreement are included for reference in our analysis:

(2) Restrictions on Transfer of Stock of [SOR]

2.1 No stock of [SOR] shall be transferred on the books of [SOR] except following compliance with the terms of this Agreement.

. . . .

2.4 Except as otherwise provided in this Agreement; a shareholder shall not sell, transfer, assign, hypothecate, give, or in any way alienate any share or shares in [SOR] or any right or interest therein; nor shall such share or shares be subject to transfer by order

- 4 -

of Court, sale upon execution of judgment, appointment of a receiver or trustee in bankruptcy for a shareholder, or other legal process resulting in an involuntary transfer of said shares; except to [SOR] or another holder of shares of [SOR], then issued and outstanding.

2.5 When a shareholder desires, or is required under the terms of this Agreement or by process of law to dispose of shares of stock in [SOR] during his lifetime, except as otherwise provided herein, he shall offer to sell all of the shares subject to such contemplated disposition to [SOR], at the price and upon the terms specified in this Agreement. [SOR] shall be notified in writing of said offer, and the same shall constitute a notice of disposition of shares, under the terms of this Agreement.

2.6 Any shares of stock of [SOR] issued after the date of this Agreement shall be subject to this Agreement and any holder hereof shall confirm in writing the holder's obligation to be bound by all of the terms, provisions, options, and restrictions of this Agreement.

(3) Purchase of Shares

3.1 Within a period of 60 days following the delivery of such notice of disposition of shares, [SOR] shall notify the holder of such shares (hereinafter referred to as the selling shareholder) if it elects to purchase all or a portion of such shares. . . .

. . . .

3.4 The purchase price and terms of such purchase shall be set forth at paragraphs 7 and 8 below.

3.5 To the extent [SOR] may not legally purchase such shares, or to the extent [SOR] shall not elect to purchase such shares, [SOR] shall within said 60[-]day period so notify all shareholder of record at that time. Any other shareholder then being a party to this Agreement may within 30 days after the service of such notice elect to purchase any part or all of the stock of [SOR] so offered. Any shareholder desiring to purchase said stock shall notify the selling shareholder in writing within said 30[-]day period. In the event more than one shareholder desires to purchase said stock, the shares available to purchase by said shareholders shall be prorated among them based on their respective stockholdings in [SOR].

3.6 In the event neither [SOR] or any shareholder shall elect to purchase said stock, the holder thereof may within a period of one year from the date of giving of said notice sell or transfer said stock as he may see fit. The person or persons acquiring the same shall, however, hold such stock again subject to all terms, conditions, and options contained in this Agreement. If no sale be made within said period of one year, no further disposition of said stock may be made without again giving the notice and providing the option to [SOR] and shareholders as herein provided.

(4) Gift Transfers

4.1 During his lifetime, a shareholder may make a gift either in trust or outright, except as otherwise herein restricted, of his shares in [SOR] to another shareholder, his mother, father, or his lineal descendants. . . .

. . . .

(6) Death of Shareholder

6.1 In the event of death of a shareholder the personal representative of his estate, trustee of his living trust, or other successor in interest of his shares shall within 90 days of the date of death of such shareholder notify [SOR] of its intent to dispose of the shares of such deceased unless the same are excluded from the terms of this Agreement under paragraph (4) above. Such notice shall constitute a notice under paragraph 3.1 above and [SOR] and the shareholders of [SOR] of record at the date of death of said deceased and then parties to this Agreement shall have all rights and options, otherwise given under the provisions of the sub-paragraphs of paragraph (3) above.

. . . .

(7) Purchase Price

7.1 The price at which shares are to be purchased and sold pursuant to this Agreement, shall be determined in accordance with the following provisions:

7.1.1 At least annually, at the annual meeting of [SOR] or as otherwise mutually agreed, the shareholders shall mutually determine a total value to be placed upon all the outstanding stock of [SOR], and the same shall be set forth annually at Exhibit "B" attached hereto.

[There is no 7.1.2 listed in the Shareholder Agreement.]

7.1.3 The total value above arrived at shall be divided by the number of outstanding shares of stock of [SOR] at the date of the event requiring a notice of disposition hereunder. The value of the shares owned by the selling shareholder shall be determined by multiplying such value per share times the total number of shares owned by such selling shareholder.

7.1.4 In the event a period of more than 1 year has elapsed from the date of the last previous agreement as to the base value contemplated under paragraph 7.1.1 above at the date of such notice of disposition, the base value shall be the last agreed value shown on Exhibit "B" or the net book value of [SOR], determined in accordance with generally accepted accounting [principles], whichever is higher.

(8) Purchase Terms

8.1 The payment of the purchase price of shares of [SOR] to be purchased and sold pursuant to this Agreement shall be as follows:

8.2 The down payment shall be 5 % of the total purchase price and shall be payable in cash at the time notification is made by the purchase of election to purchase, or upon determination of the total purchase price under the provisions of this Agreement, whichever is later.

8.3 The balance of the purchase price shall be represented by a promissory note of the purchaser or purchasers payable in 15 equal annual installments on the anniversary date of the payment of the down payment.

8.4 Such promissory note shall be non-negotiable in form and shall bear interest at the rate of 8% per annum on the unpaid principal balance, with such interest payable on the annual payment date of principal. The holder of such note shall have the right to declare the same due and payable in full in the event of default in the making of any payment, and

time shall be considered the essence thereof. In the event of the death of the maker of the note, any unpaid balance of that note shall become immediately due and payable at the election of the holder of the note.

8.5 In the case of any sale having part of the purchase price paid in future installments the selling shareholder shall, upon receiving the down payment in cash, and delivery of said note for the balance of the purchase price, endorse the certificates representing the shares being sold to the purchaser or purchasers of said shares.

8.6 So long as no default occurs in the making of the payment of such note, the purchaser of the shares shall be entitled to receive all dividends thereon and shall be entitled to vote such shares.

In addition, the shareholders executed an amendment to the Shareholders' Agreement on January 2, 1998, adding, among other things, section 2.7, which provided:

Unless waived by the other Shareholders or by [SOR's] failure to exercise its rights under this Shareholders Agreement, share of stock in [SOR] are to be owned only by Mary Louise . . . , Darrell . . . , their children or descendants, and by persons who are married to them. In the event that any Shareholder ceases to be married to Mary Louise and Darrell['s] children or their direct lineal [descendants], then this fact shall be considered as an event referred to in paragraph 3.2 of this Agreement.

All of the then-current shareholders, including Lori and Butch, signed the 1998 Amendment which provided that Lori and Butch, by accepting gifts of shares from their parents, agreed to be bound by the terms of the Shareholders' Agreement and the 1998 Amendment.

Following Mary Louise's death in 2005, her shares were transferred into a trust for the benefit of Darrell during his lifetime, and for her children and grandchildren thereafter, which complied with the Shareholders' Agreement in the sense that it kept shares of SOR within the family. Notably, that trust contained provisions governing the shares it held in SOR. Again, we quote from the relevant provisions of Mary Louise's Trust:

**X. DIVISION OF TRUST SHARE AT DEATH OF GRANTOR**

Upon the death of Grantor, the following provisions shall apply:

. . . .

(C) To the extent that the "Mary Louise Schuler Family Trust Share" or the "Mary Louise Schuler Remainder QTIP Trust Share" holds stock in [SOR], or any successor or other closely-held corporation, the following provisions shall apply:

(1) Grantor directs the Trustee to vote against any repurchase by the corporation of corporation stock after Grantor's death pursuant to the terms and provisions of the [SOR] Shareholders Agreement dated December 1, 1983, and as amended from time to time ("Shareholders Agreement").

(2) Until expiration of the time periods referenced in Paragraphs X(C)(5) and X(C)(6), [Butch] shall possess a proxy on all shares of stock in [SOR] held in either the "Mary Louise Schuler Family Trust Share" or the "Mary Louise Schuler Remainder QTIP Trust Share" and shall have [the] power to make all decisions related to such shares, with the exceptions that the Trustee alone shall vote to approve any valuation of these shares of

stock as provided in paragraph 7 of the Shareholders Agreement and that [Butch] shall have no right to exercise the power of repurchase set forth in the Shareholders Agreement. . . . At the expiration of the period of time referenced in Paragraphs X(C)(5) and X(C)(6), each current beneficiary of the "Mary Louise Schuler Family Trust Share" or the "Mary Louise Schuler Remainder QTIP Trust Share" shall possess the right to vote his or her own shares of stock in [SOR] held in either the "Mary Louise Schuler Family Trust Share" or the "Mary Louise Schuler Remainder QTIP Trust Share[."]

(3) Following [the] death of Mary Louise . . . , if Lori . . . , her issue, her spouse, or [Butch] exercise their options to purchase shares of [SOR] stock held either by the estate of Mary Louise Schuler or this Trust pursuant to the Shareholders Agreement, then [Butch] shall have a limited power to appoint, in trust or otherwise, any or all assets remaining in the "Mary Louise Schuler Family Trust Share" and the "Mary Louise Schuler Remainder QTIP Trust Share" at the death of the survivor of Mary Louise . . . and Darrell . . . to or among Grantor's issue and any charities that qualify as charitable organizations pursuant to I.R.C. § 2055(a). [Butch] shall not have the power to appoint the assets under any circumstances to himself, his estate, his creditors, or creditors of his estate. [Butch] shall exercise the limited power provided in this paragraph within sixty (60) days of the death of the survivor of Mary Louise . . . or Darrell . . . . If [Butch] does not exercise the limited power within this period, the right to exercise the power to appoint the trust share shall fail.

(4) Following [the] death of Mary Louise . . . , if [Butch], his issue, or his spouse exercises their options to purchase shares of [SOR] stock held either by the estate of Mary Louise . . . or this Trust pursuant to the Shareholders Agreement, then Lori . . . shall have a limited power to appoint, in trust or otherwise, any or all assets remaining in the "Mary Louise Schuler Family Trust Share" and the "Mary Louise Schuler Remainder QTIP Trust Share" at the death of the survivor of Mary Louise . . . and Darrell . . . to or among Grantor's issue and any charities that qualify as charitable organizations pursuant to I.R.C. § 2055(a). Lori . . . shall not have the power to appoint the assets under any circumstances to herself, her estate, her creditors, or creditors of her estate. Lori . . . shall exercise the limited power provided in this paragraph within sixty (60) days of the death of the survivor of Mary Louise . . . or Darrell . . . . If Lori . . . does not exercise the limited power within this period, the right to exercise the power to appoint the trust share shall fail.

(5) Provided the repurchase provisions of the Shareholders Agreement are not invoked at the death of Mary Louise . . . , Lori . . . shall have the unrestricted right for a period ending six (6) months after the death of the survivor of Mary Louise . . . and Darrell . . . to require the Trustee to offer to sell all or any part of the shares of stock in [SOR] or any successor entity to such corporation otherwise distributable to the Lori R. Nerud Trust Share pursuant to the terms of this Trust Agreement, by making first offer of such stock, in writing, to [SOR] or to [Butch]. If [SOR] or [Butch do] not accept the offer in whole or in part in writing within thirty (30) days after receipt of such offer, the Trustee shall make a similar offer in writing to all of the other Shareholders, each of whom shall have the right to purchase such portion of the remaining stock offered for sale as the number of shares owned by the Lori R. Nerud Trust Share at such date shall bear to the total number of shares owned by all of such Shareholders, excluding the Lori R. Nerud Trust Share; provided,

however, that if any Shareholder does not purchase all or any part of the Lori R. Nerud Trust Share's proportionate share of such offered stock, the other Shareholders may purchase proportionally the balance of such shares in the manner described above. To the extent that [SOR], [Butch], and the Shareholders do not accept the offer within the thirty (30) day period following each respective offer, the Trustee shall sell such stock to any other proposed transferee at Lori['s] direction under the terms identified in the offer to the corporation during a thirty (30) day period following the expiration of the offer to the other Shareholders.

(6) Provided the repurchase provisions of the Shareholders Agreement are not invoked at the death of Mary Louise . . . , [SOR] or [Butch] shall have the unrestricted right for a period ending six (6) months following the death of the survivor of Mary Louise . . . and Darrell . . . to purchase from the Lori R. Nerud Trust Share all or any part of the shares in [SOR] or any successor entity to such corporation otherwise distributable to the Lori R. Nerud Trust Share pursuant to the terms of this Trust Agreement. [SOR] or [Butch] shall notify all Shareholders of its or his intent with regard to the exercise of this option within thirty (30) days following the date of notification of Lori . . . . The right of [SOR] or [Butch] to purchase such stock under this option shall be absolute and shall not be subject to the consent requirements of Nebraska Probate Code Section 30-2822(2).

(7) The purchase price for such stock purchased pursuant to either Paragraphs X(C)(5) or X(C)(6) shall be the fair market value as agreed upon between [Butch] and Lori . . . . If these parties cannot agree, the Trustee shall select and pay the costs of an independent appraiser qualified to determine the net worth of the corporation. The appraiser's determination regarding the fair market value shall be binding upon the parties and the Lori R. Nerud Trust Share shall be paid the proportionate percentage of the appraised value of the corporation based on the Lori R. Nerud Trust Share's interest in the company, provided that each party shall have twenty (20) days after receiving notification of the appraisal price to rescind the offer made pursuant to Paragraphs X(C)(5) or X(C)(6).

Darrell's Trust contained the same provisions.

Generally speaking, stock transfer restrictions, such as redemption agreements, are generally enforceable under Nebraska law. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). See also *F.H.T., Inc. v. Feuerhelm*, 211 Neb. 860, 320 N.W.2d 772 (1982) (holding restrictive covenants in private shareholder agreements between stockholders are binding on parties to such agreements). Further, Neb. Rev. Stat. § 30-3828 (Cum. Supp. 2024) sets forth the requirements for creation of a valid trust in Nebraska.

In this case, neither party contests the validity of the trusts created by Mary Louise or Darrell or that the trustees of those trusts were required to administer the assets funded within the trusts, including shares in SOR, in accordance with the terms set forth in the corresponding Trust Agreements. Further, no party contests the validity of the Shareholders' Agreement or that, by its terms, it provided transfer restrictions governing all shares of stock in SOR. As such, with the validity of both the Shareholders' Agreement and Mary Louise's and Darrell's Trust Agreements not in issue, we look to the language of those instruments in relation to the issues framed by the litigants here.

- 9 -

As the Nebraska Supreme Court recently stated in *Seemann v. Seemann*, 318 Neb. 643, 651–52, 18 N.W.3d 118, 125–26 (2025):

> In interpreting contracts, the court as a matter of law must first determine whether the contract is ambiguous. A determination as to whether an ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties. The fact that the parties have suggested opposite meanings of a disputed contract does not necessarily compel the conclusion that the contract is ambiguous. The meaning of a contract and whether a contract is ambiguous are questions of law.

> A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. When the terms of a contract are clear, a court may not resort to rules of construction, and the terms are accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them. A court shall seek to ascertain the intention of the parties from the plain language of the contract. If it can be avoided, no word, clause, or sentence of a contract will be rejected as superfluous or meaningless.

> In determining whether certain provisions of a contract are ambiguous, we focus on the words employed and construe any undefined words in harmony with their plain and generally accepted meaning and by reference to all the parts and provisions of the agreement and the nature of the transaction that forms its subject matter. In addition to dictionary definitions, a plain meaning analysis must include reading words and phrases in context and construing them in accordance with the rules of grammar and common usage. A court will give due force to the grammatical arrangement of the clauses of a contract, unless by so doing it appears to be at variance with the intent of the parties as indicated by the contract as a whole.

Similarly, rules of construction for interpreting a trust are applied when the language of the trust is not clear; but if the language clearly expresses the settlor's intent, the rules do not apply. *In re Robert L. McDowell Revocable Trust*, 296 Neb. 565, 894 N.W.2d 810 (2017). We find that the language in the Shareholders' Agreement and Trust Agreements is clear and unambiguous, and when read together, are dispositive of the issue presented here.

First, the Shareholders' Agreement unambiguously provides that its purpose was to ensure the shares of stock in SOR remained in Darrell and Mary Louise's family, if possible. In order to ensure that continuity, Darrell and Mary Louise created options in the 1983 Shareholders' Agreement to preserve that right in the existing shareholders and their future lineal descendants. The language governing that option is set forth in §§ 2 and 3 of the 1983 Shareholders' Agreement and provides, in relevant part, that when a shareholder desires to dispose of his or her shares, he or she must notify SOR of his or her desire to sell in accordance with the purchase price and terms set forth in the Shareholders' Agreement. If such offer is made, SOR must timely elect to purchase the shares on those terms, and if it fails to do so, the right to purchase the shares on those same terms transfers to the other shareholders, who again must timely exercise that right of purchase. If neither SOR nor shareholders timely exercise the option, the selling shareholder retains the right to sell the shares to a third party. But if the selling shareholder does not exercise that right within 1 year, the selling shareholder must repeat the process. Notably, in addition to the process

beginning by a shareholder communicating his or her desire to sell shares, § 6.1 of the 1983 Shareholders' Agreement makes clear that the death of a shareholder starts the same process by which SOR, then the other shareholders have a right to purchase the shares at the ascertained value.

In this case, when Mary Louise passed away in 2005, her death triggered the right of SOR and shareholders to purchase her shares at the price set forth in the Shareholders' Agreement. The evidence demonstrates that no party exercised that right. As such, the shares were transferred to Mary Louise's Trust and were held there for the benefit of Darrell and their children, Lori and Butch. The Shareholders' Agreement allowed ownership of SOR stock to be held in Mary Louise's Trust. But notably, while held in the Trust, the Trust Agreement provided options in favor of SOR and Butch to purchase the shares held in Mary Louise's Trust. As specifically stated therein, if SOR and other shareholders did not exercise their option to purchase Mary Louise's shares upon her death in accordance with the terms of the Shareholders' Agreement, which as explained above did not occur, the Trust Agreement provided that upon Darrell's death, Lori had an option to instruct the trustee to offer those shares to SOR  or Butch at FMV and that SOR  and Butch had the right to elect to purchase those shares at FMV. That option lasted for 6 months following Darrell's death.

Notably, the evidence demonstrates that, following Darrell's death in April 2017, Lori attempted to exercise that option by sending a written notice on or about August 2017 to SOR and Butch instructing them of her desire to sell her shares in SOR. But as § X(C)(5) of Mary Louise's Trust makes clear:

> If [SOR] or Butch does not accept the offer in whole or in part *in writing within thirty (30) days* after receipt of such offer, the Trustee shall make a similar offer in writing to all of the other Shareholders, each of whom shall have the right to purchase such portion of the remaining stock offered for sale as the number of shares owned by the Lori R. Nerud Trust Share at such date shall bear to the total number of shares owned by all of such Shareholders . . . To the extent that [SOR], [Butch], and the Shareholders do not accept the offer within the thirty (30) day period following each respective offer, the Trustee shall sell such stock to any other proposed transferee at Lori R. Nerud's direction under the terms identified in the offer to the corporation during a thirty (30) day period following the expiration of the offer to the other Shareholders.

(Emphasis supplied.)

As the Nebraska Supreme Court held in *Wolf v. Tastee Freez Corp.*, 172 Neb. 430, 432, 109 N.W.2d 733, 735 (1961):

> the acceptance of an offer must be made within the time specified in the offer is a general rule of law. In Restatement, Contracts, § 40 (1), p. 47, it is said: "The power to create a contract by acceptance of an offer terminates at the time specified in the offer. . ."

Whereas the record is clear that Lori timely exercised her option to offer to sell her shares, the record is equally clear that SOR, Butch, and the other shareholders did not timely accept Lori's offer to sell her shares at FMV dictated by the terms of the Trust Agreements. And although the record is clear that Lori and Butch attempted to reach an agreement regarding the sale of Lori's shares, Butch did not accept the offer in writing within 30 days. Nor does it appear that the other

- 11 -

shareholders were offered their right to then buy the shares at FMV. Regardless, rather than trying to sell the shares to a third party, the trustee simply distributed Lori's proportionate interest in the shares directly to Lori, and Lori owned them in her own name thereafter free of the Trust. Darrell's shares were supposed to be funded in his Trust, which would have provided the same option for Lori to sell them. We will not repeat the analysis here because no offer was accepted by SOR, Butch, or any other shareholders. And rather than fund Darrell's Trust, the personal representative simply distributed the shares from Darrell's estate to Lori and Butch. The result is the same.

In short, because SOR, Butch, and the other shareholders did not timely accept Lori's offer to sell her shares pursuant to the options created in the Trust Agreements, we agree with the district court that no contract was formed to sell and purchase the shares under the terms of the Trust Agreements. And since the shares were subsequently transferred out of the Trust to Lori and are no longer subject to the Trust Agreements, we will separately analyze whether a contract was made under the terms of the Shareholders' Agreement.

As mentioned above, the Shareholders' Agreement separately provided for an owner of shares desiring to sell them the obligation to offer to sell his or her shares to SOR and then the other shareholders. Again, that offer required a timely notice of acceptance by the offerees. And as the Trust Agreement referenced, SOR, Butch, and the other shareholders had the right to purchase the shares at book value upon Mary Louise's death, which right no party timely exercised, which is why the shares were placed in Mary Louise's Trust. And, as we previously mentioned, prior to transferring the shares out of the Trust, both Lori and Butch had options to sell and purchase the shares, which neither timely accepted. And, notably, section x(c)(2) of the trusts provided that "until the expiration of the time periods referenced in x(c)(5) and x(c)(6). . .[Butch] shall have no right to exercise the power of repurchase set forth in the Shareholder's Agreement." Because no one exercised their power under the terms of the Trust to purchase the shares once offered by Lori while the shares were held in Trust, and Butch was forbidden from repurchasing the shares under the Shareholders' Agreement while the shares were in a Trust, this resulted in the shares being transferred, free of the Trust, to Lori. Following a transfer of the shares free of the Trust, the Shareholders' Agreement continued to govern the shares and restricted their transfer. Although Butch has no current right to require Lori to sell the shares, Lori retains the right to sell her shares, but to do so, she must first offer to sell her shares to SOR and the other shareholders at book value. Again, that right requires timely notice and timely acceptance by the offeree or offerees.

And again, upon review of the record, there is no indication of a timely notice by Lori of an intent to sell under the terms of the Shareholders' Agreement nor a timely exercise by the group consisting of SOR, Butch, or the other shareholders as those rights are defined. Taken together, we find, on this record, the district court did not err in determining that, when applying the terms set forth in the Shareholders' Agreement and the Trust Agreements which terms controlled the sale of these shares by and among SOR and the shareholders, no written contract existed between Lori and Butch for the sale of Lori's shares of SOR. Accordingly, Lori and Butch's argument that the district court erred in finding no written contract existed fails.

Lori separately assigns that the district court erred in finding that no oral implied contract existed between the parties as of April 28, 2020, where Butch made a partial payment for her shares, which "rendered the terms of the oral agreement reasonably certain." Brief for appellant at 11.

As the Nebraska Supreme Court stated in *Linscott v. Shasteen*, 288 Neb. 276, 281–82, 847 N.W.2d 283, 289–90 (2014):

> An implied contract arises where the intention of the parties is not expressed in writing but where the circumstances are such as to show a mutual intent to contract. Evidence of facts and circumstances, together with the words of the parties used at the time, from which reasonable persons in conducting the ordinary affairs of business, but with special reference to the particular matter on hand, would be justified in inferring such a contract or promise, is sufficient. The determination of the parties' intent to make a contract is to be gathered from objective manifestations—the conduct of the parties, language used, or acts done by them, or other pertinent circumstances surrounding the transaction. If the parties' conduct is sufficient to show an implied contract, it is just as enforceable as an express contract.

We reject Lori's argument for two reasons. First, although Lori desired to sell her shares to Butch, it is also clear that the parties never agreed upon a price for those shares. As the Nebraska Supreme Court stated in *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. 848, 862, 809 N.W.2d 725, 740–41 (2011):

> . . . unless the parties have stated otherwise in an express agreement, extrinsic standards can only provide a basis for understanding a contract. The circumstances must still show that the parties manifested an intent to be bound by a contract. And their manifestations are usually too indefinite to form a contract if the essential terms are left open or are so indefinite that a court could not determine whether a breach had occurred or provide a remedy. "The more important the uncertainty, the stronger the indication is that the parties do not intend to be bound[.]" As relevant here, if the parties' manifestations or conduct shows that they do not intend to be bound by a contract unless they agree upon the price for services and they fail to agree, there is no contract.

On the record before us, it is clear that Lori desired to sell her shares commencing in August 2017 but that the parties never agreed on a price. Because of their inability to agree, Lori attempts to bootstrap the terms of the Trust Agreements and claim Butch was obligated to purchase the shares at FMV. Conversely, Butch attempts to bootstrap the terms of the Shareholders' Agreement to claim Lori is obligated to sell her shares at book value. As we explained before, neither party entered into a binding obligation under the terms of those written agreements, and their inability to arrive at a price for Lori's shares, which is an essential term, and without such agreement, demonstrates a lack of intent to be bound by a contract. The district court did not clearly err in finding that the parties' manifestations and conduct showed that they did not intend to be bound

by a contract unless they agreed upon a price, and having failed to so agree, no contract for the sale of Lori's shares existed between them.

Second, as we stated before, the shares in SOR are governed by the Shareholders' Agreement. Under the terms of that Agreement, a party desiring to sell must make timely notices which provide timely options to purchase shares by SOR and then all of the shareholders. As we explained before, Lori's initial offer to sell her shares was not followed by a timely notice of acceptance by SOR, Butch, or the other shareholders. As such, once Lori's offer expired, she was not free to simply negotiate unilaterally with Butch governing the sale of her shares. She was bound to follow the terms of the Shareholders' Agreement, which set forth a process she was obligated to follow, and a separate oral agreement between Lori and Butch, without including all parties with rights of purchase, is invalid. The district court did not clearly err in finding no oral contract existed between Lori and Butch.

ISSUES RELATING TO VALUATION EVIDENCE

The next set of issues raised by the parties relate to the valuation of Lori's shares of SOR. Lori alleged that the district court erred in failing to consider expert valuation testimony, disregarding valuation evidence, and in failing to allow her to amend her pleadings to conform to valuation evidence presented at trial. Both parties argue that the district court erred in failing to determine the value of Lori's shares. But having found that no written contract or oral contract existed between Lori and Butch, we find no error in the court's failure to consider evidence of value because, as we previously explained, that consideration was not relevant to the outcome of the case. An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it. *Continental Indem. Co. v. Starr Indem. & Liab. Co.*, 320 Neb. 574, 28 N.W.3d 843 (2025).

ERROR IN ENTERING PARTIAL
SUMMARY JUDGMENT FOR $291,000

Lori assigns that the district court erred in granting partial summary judgment against her for $291,000. She contends that this assignment of error is just cautionary because the final judgment "likely novates and supersedes the Court's prior Judgment entered against Lori because it added a time period for Lori to return the $291,000." Brief for appellant at 26. We agree. The final order entered ordered Lori to return to Butch $250,000 and $41,000 for the pivots and money she acquired from Butch in 2020 and ordered her to make that return within 90 days or the judgment would accrue interest at the current judgment interest rate. Neither party assigns error to this finding if the district court's declaratory order finding no contract existed is affirmed. Having affirmed the district court's order, we find no error with the district court's determination on summary judgment that the amount should be returned by Lori.

CONCLUSION

For the reasons stated herein, we affirm.

AFFIRMED.